UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS RESTAURANT ASSOCIATION, HOSPITALITYMAINE, NEW HAMPSHIRE LODGING & RESTAURANT ASSOCIATION, RHODE ISLAND HOSPITALITY ASSOCIATION, RESTAURANT LAW CENTER, and the NATIONAL PORK PRODUCERS COUNCIL,<br><br>    Plaintiffs,<br><br>  v.<br><br>MAURA HEALEY, in her Official Capacity as the Attorney General of Massachusetts, and JOHN LEBEAUX, in his Official Capacity as Commissioner of the Massachusetts Department of Agricultural Resources,<br><br>    Defendants. | Civil Action No. 22-cv-11245 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Massachusetts Restaurant Association, HospitalityMaine, New Hampshire Lodging & Restaurant Association, Rhode Island Hospitality Association, Restaurant Law Center, and the National Pork Producers Council (collectively, "Plaintiffs") as for their Complaint for Declaratory and Injunctive Relief against Defendant Maura Healey in her official capacity as the Attorney General of Massachusetts and John Lebeaux, in his official capacity as Commissioner of the Massachusetts Department of Agricultural Resources (collectively, "Defendants"), allege as follows:

## INTRODUCTION

As explained below, Defendants should be enjoined from enforcing M.G.L. c. 129 App. §§ 1-3(C), 1-6, 330 CMR § 35.04(1)(c), and the official guidance interpreting same[1] (the "Pork Rules") until after the Supreme Court of the United States completes its pending review of a dormant Commerce Clause challenge to a materially identical California statute.[2] Urgent preliminary relief is needed because the Pork Rules are scheduled to take effect on August 15, 2022.

## PARTIES

1. The Plaintiffs are six not-for-profit trade associations.

2. The Massachusetts Restaurant Association is a nonprofit trade group founded in 1934 representing approximately 1,800 members encompassing 5,500 restaurants, caterers, and foodservice companies that do business in Massachusetts. Its purpose, in part, is to represent and advocate on behalf of the interests of the restaurant and foodservice industries in the state.

3. HospitalityMaine, formerly known as the Maine Restaurant Association, is a nonprofit trade group representing Maine's foodservice and lodging industries. The hospitality industry in Maine if one of the state's leading economic drivers and employers.

4. The New Hampshire Lodging & Restaurant Association is a nonprofit trade group founded in 1919 that serves New Hampshire's hospitality and foodservice industries.

---

[1] "33 CMR 35.00 – FAQ," Mass. Dept. of Agricultural Resources, July 11, 2022 (available at https://tinyurl.com/2tkyw54p) (last accessed Aug. 2, 2022).

[2] It is very likely that the Supreme Court will reverse the Ninth Circuit's decision holding the California law constitutional. *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1029 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 1413 (2022). The Supreme Court usually reverses the cases it decides to review. During the 2021-2022 term, it decided 66 cases and reversed 54 times, resulting in a 81.8% reversal rate. In fact, while the Supreme Court reviewed far more cases from the Ninth Circuit than any other, it reversed all of them last term — a 100% Ninth Circuit reversal rate.

5.     The Rhode Island Hospitality Association is a nonprofit trade group founded in 1963 that serves Rhode Island's hospitality and foodservice industries.

6.     The Restaurant Law Center serves as the voice of America's restaurants in the courtroom advancing the policy interests of the industry.  It is an independent public policy organization affiliated with the National Restaurant Association, the largest foodservice trade association in the world.

7.     The National Pork Producers Council ("NPPC") is an agricultural organization representing the interests of the $28-billion-a-year United States pork industry. Its members include pig farmers as well as the pork supply chain and associated businesses such as veterinarians, packers and processors, and related companies.

8.     Defendant Maura Healey, sued here in her official capacity, is the Attorney General of the Commonwealth of Massachusetts.

9.     Defendant John Lebeaux, sued here in his official capacity, is the Commissioner of the Massachusetts Department of Agricultural Resources

## JURISDICTION AND VENUE

10.    This action arises under the Commerce Clause of the Constitution of the United States of America.  U.S. Const. art. I, § 8, cl. 3 (granting Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]")

11.    This affirmative grant of authority to legislate in the area of interstate commerce "has long been understood, as well, to provide 'protection from state legislation inimical to the national commerce [even] where Congress has not acted....'" *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999) (*quoting Barclays Bank PLC v. Franchise Tax Bd. of*

*Cal.*, 512 U.S. 298, 310 (1994)), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).

12. "This negative command, known as the dormant Commerce Clause, prohibits states from acting in a manner that burdens the flow of interstate commerce." P*harm. Rsch. & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 79 (1st Cir. 2001), *aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003) *citing Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179–80, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995); *Healy v. Beer Inst.*, 491 U.S. 324, 326 n. 1, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).

13. The Pork Rules violate the dormant Commerce Clause and deprive Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution and principles of interstate federalism embodied in the Constitution's structure.

14. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331.

15. This Court has general personal jurisdiction because Defendants perform their official duties in the forum state.

16. Venue lies in this District pursuant to 28 U.S.C. § 1391(b)(1), (2), and (3) because Defendants perform their official duties in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

### FACTUAL ALLEGATIONS

### The Pork Rules

17. The statute at issue, M.G.L. c. 129 App. § 1-3(C), makes it unlawful "for a business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any… Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the

immediate offspring of a covered animal that was confined in a cruel manner." Together with 330 CMR § 35.04(1)(c) and official guidance interpreting same,[3] these prohibitions are referred to herein as the "Pork Rules."

18. "Confined in a cruel manner" is defined as "confining… a breeding pig in a manner that prevents the animal from laying down, standing up, fully extending the animal's limbs or turning around freely." M.G.L. c. 129 App. § 1-5.

19. Each violation of the act is punishable by a civil fine not to exceed $1,000. M.G.L. 129 App. § 1-6.

20. The Massachusetts Attorney General has exclusive authority to enforce the Pork Rules. *Id*.

21. M.G.L. c. 129 App. § 1-3(C) is the result of a November, 2016 ballot initiative referred to as "Question 3."

22. By the terms of the ballot initiative, voters gave the pork industry two years to adapt to regulations interpreting the new law. In particular, they voted to require the Attorney General to promulgate regulations for the act's implementation "on or before January 1, 2020" and set January 1, 2022 as the effective date of the statute. M.G.L. c. 129 App. §§ 1-10, 1-11 (pre-Dec. 22, 2021).

23. The Attorney General did not meet this deadline.

24. Instead, in late December, 2021, the statue was amended to transfer rulemaking authority to the Massachusetts Department of Agricultural Resources ("MDAR") and to give it

---

[3] "33 CMR 35.00 – FAQ," Mass. Dept. of Agricultural Resources, July 11, 2022 (*available at* https://tinyurl.com/2tkyw54p) (last accessed Aug. 2, 2022).

six additional months to promulgate regulations. M.G.L. c. 129 App. §§ 1-10, 1-11 (post-Dec. 22, 2021).

25.     The effective date of the Pork Rules was then set for August 15, 2022. M.G.L. c. 129 App. § 1-12 (post-Dec. 22, 2021).

26.     So, instead of two years, the pork industry has been given roughly eight weeks to adapt.

27.     On June 10, 2022, MDAR promulgated regulations that require for the first time that breading pigs must always be able to turn around "without touching the side of an Enclosure or another animal." 330 C.M.R. § 35.02 (emphasis added).

28.     It also explained for the first time what particular kinds of certification (and from whom) are required to demonstrate compliance with the law. 330 C.M.R. § 35.05.

29.     Then, on July 11, 2022 MDAR issued official guidance that, for the first time, interpreted the definition of "Sale" as the term is used 330 CMR 35.02. It explained that an out-of-state company that sells pork wholesale to a Massachusetts distributor would be required to comply with the Pork Rules <u>even if the Massachusetts company only distributes out-of-state</u>.[4]

30.     This July 11, 2022 guidance also explained, for the first time, that Pork Rules will apply to all pork *harvested*, instead of *born*, after the August 15, 2022 effective date. This interpretation has the effect of requiring compliance with the Pork Rules as of roughly October, 2021 because it takes roughly ten months from breading to raise a finished market hog (a sow is pregnant for roughly four months and a piglet grows to market size in roughly six months). By interpreting the statute to look to the date of harvest instead of the date of birth, MDAR has

---

[4] "33 CMR 35.00 – FAQ," Mass. Dept. of Agricultural Resources, July 11, 2022 (*available at* https://tinyurl.com/2tkyw54p) (last accessed Aug. 2, 2022).

given the Pork Rules retroactive effect over millions of hogs alive today.  It has done so despite the legislature's clear command giving the pork industry until August 15, 2022 to begin compliance.  M.G.L. c. 129 App. § 1-12 (post-Dec. 22, 2021).

31. MDAR has even taken the position that the Pork Rules would apply to sales to the federal government that occur in Massachusetts.  These include sales to the United States Department of Agriculture's National School Lunch program, federal offices, military bases, a federal prison, and other facilities.  Such interference with the operation of federal agencies raises additional constitutional questions.  *See North Dakota v. U.S.,* 495 U.S. 423 (1990).

### California's Proposition 12

32. In November 2018, California voters adopted a ballot initiative referred to as "Proposition 12."

33. The key provision of Proposition 12 mirrors the Massachusetts Pork Rules.

34. It bans the sale of pork born to a sow confined in a way that prevents her "from lying down, standing up, fully extending the animal's limbs, or turning around freely." Cal. Health & Safety Code § 25991.

35. Plaintiff NPPC filed a lawsuit in the United States District Court for the Southern District of California challenging the constitutionality of Proposition 12.

36. In particular, NPPC sought a declaration that the California law violated the dormant Commerce Clause of the United States Constitution. *Nat'l Pork Producers Council v. Ross*, 456 F. Supp. 3d 1201, 1204 (S.D. Cal. 2020), *aff'd*, 6 F.4th 1021 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 1413 (2022).

37. The District Court and Ninth Circuit both refused to grant relief, holding that — under Ninth Circuit precedent — California could require out-of-state pork producers to make

massive alterations to their business practices as the price of continuing to be able to access the California market. *Id*.

38. In particular, the Ninth Circuit concluded that the requirements imposed by Proposition 12 "apply to both California entities and out-of-state entities, and merely impose a higher cost on production, rather than affect interstate commerce." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1029 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 1413 (2022).

39. On September 27, 2021, NPPC filed a petition for writ of certiorari with the Supreme Court of the United States.

40. As explained therein, while Proposition 12 might appear on its face to apply neutrally to farms located both inside and outside of the state, California produces little pork.

41. In fact, California imports almost all of the pork that it consumes.

42. Accordingly, the practical effects of Proposition 12 are almost entirely extraterritorial.

43. In addition, NPPC argued, the law imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Id*.

44. The Supreme Court granted certiorari on March 28, 2022. *See* No. 21-468 *Nat'l Pork Producers Council v. Ross,* 142 S. Ct. 1413 (U.S. Mar. 28, 2022).

45. Argument is scheduled for October 11, 2022. Accordingly, a decision is expected at roughly the end of 2022, and in any event no later than the end of the Supreme Court's term in June 2023.

46. In addition to a number of industry and advocacy groups, NPPC's appeal enjoys amicus support from the Biden administration.

47. The United States submitted a brief calling for the reversal of the Ninth Circuit and asking the Supreme Court to find that NPPC's complaint states a claim that "Proposition 12 is unconstitutional under *Pike* [*v. Bruce Church, Inc*., 397 U.S. 137 (1970)]."

48. Likewise, the states of Alabama, Arizona, Arkansas, Georgia, Idaho, Iowa, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wyoming have unanimously agreed that the statute is unconstitutional.

**The Pork Industry**

49. Massachusetts has no pork industry to speak of.

50. While there are a few farms that raise pigs in the state, they are either demonstration farms or small-scale operations offering artisanal products, mostly directly to consumers

51. Massachusetts farms do not utilize enclosures outlawed by the Pork Rules.

52. Almost all of the pork consumed in Massachusetts comes from out-of-state.

53. Massachusetts is, however, home to pork distribution facilities that serve other New England states.

54. Iowa, Minnesota, North Carolina, Illinois, Indiana, and Missouri are the largest pork producers, together accounting for the lion's share of American production.

55. Many of the sows commercially farmed in the United States are not currently housed in compliance with the Pork Rules.

56. In particular, many farmers keep sows in smaller individual pens during the period between weaning piglets from one litter, through a sows recovery, her rebreeding and then confirmation of her pregnancy. This is done for both animal health and welfare reasons.

57. Sows in group housing experience more injuries and fatalities than sows housed in breeding stalls because they are exposed to aggression.

58. Sows in breeding stalls are generally calmer and healthier.

59. Providing health care and critical nutrients to pregnant sows is more difficult in group settings.

60. Group settings also pose greater risk to farm workers. Sows weigh roughly 500 pounds and can be aggressive.

61. Producing Massachusetts-compliant pork would require many famers to change their business practices and make physical renovations to their production facilities.

62. This would be expensive and time-consuming and could ultimately reduce the farmer's yield.

63. Even if a farm did renovate in an effort to comply with the Pork Rules, the complex pork supply chain is unequipped to differentiate between compliant and non-compliant hogs alive today.

64. Sometimes piglets are raised to market weight on the farm on which they were born.

65. But often, after about 20 days, piglets are weaned and then transferred to a nursery farm. On average, they will stay at that nursery farm for about six to eight weeks.

66. Afterward, they will travel again to a finishing farm, where they will stay for another 3½ or 4 months before heading to market.

67. Overall, the entire process from birth to slaughter usually takes six or seven months.

68. With pigs changing hands so many times, no single farmer can attest to the use of Massachusetts-size enclosures at each step of the way.

69. The supply chain only becomes even more complex once the hogs reach market weight and are shipped to a slaughter facility.

70. These slaughter facilities typically receive hogs from hundreds of farms, both independent and large-scale, spread across an area of thousands of square miles.

71. The hogs that arrive at a particular pork slaughter facility come from farms providing a wide variety of living conditions to the sows and market animals under their care.

72. Upon arrival, the hogs are moved into one or more pens of various sizes.

73. Slaughter is then completed primarily via a single production line at the pork processing facility.

74. Very few pork slaughter facilities in the United States have more than one production line, so pigs from all over a region end up funneled through that one line, becoming indistinguishable.

75. After the pork is processed, it is packaged, labelled, and stored at the processing facility, and then shipped to one or more distributor.

76. There could be many different distributors, wholesalers, resellers, or others who trade these commodity products and take possession and control of any one cut of pork during its journey from the plant to the dinner plate.

77. Finally, the pork is shipped to institutions, retailers, and restaurants.

78. There are, therefore, a minimum of seven steps in the American pork supply chain. The pigs must be (1) born/weaned, (2) raised to market weight, (3) shipped to slaughter facilities, (4) processed, (5) packaged, (6) stored, and (7) shipped again.

79. Accordingly, compliance with the Pork Rules is not merely a matter of changing the size of the pens, it is the far more complex task of taking a supply chain developed to create and deliver a consistent commodity and reconfiguring it to differentiate Massachusetts meat at each step of way.

80. In recognition of the difficulties of compliance, a California court entered an injunction prohibiting Proposition 12 from coming into effect until 180 days following the state's enactment of regulations. *Cal. Hispanic Chambers of Commerce et. al. v. Ross et. al.*, Case No. 34-2021-80003765 (Supp. Ct. Cal., Sacramento).

81. California has not yet promulgated rules, so the injunction remains in force.

82. Proposition 12 has not yet been enforced.

### The Need For Urgent Injunctive Relief

83. If the Pork Rules go into effect on August 15, 2022, conventionally farmed pork will be forced out of the Massachusetts market and there will be little to replace it.

84. The food supply throughout the region will be disrupted because Massachusetts is home to distribution centers serving New Hampshire, Maine, Rhode Island, and Vermont and MDAR has taken the position that the Pork Rules apply to pork that merely passes through the hands of a Massachusetts distributor on its way to being consumed in another state.

85. Massachusetts has provided no notice to businesses and consumers in New Hampshire, Maine, Rhode Island, and Vermont who could wake up in a matter of weeks to discover that the bacon they enjoy at breakfast has been taken off the market by Massachusetts voters and regulators.

86. Countless farmers, processors, brokers, distributers and other members of the NPPC will suffer irreparable harm in the form of lost sales, lost business relationships, and lost customers.

87. The members of the four restaurant trade groups that are Plaintiffs in this case will also suffer irreparable harm. These restaurants form a last link connecting the pork supply chain to consumers and stand to be irreparably harmed if forced to stop offering conventionally raised pork. They will lose sales, lose relationships with existing vendors, and ultimately lose customers if the Pork Rules abruptly go into effect on August 15, 2022 and there is insufficient pork to satisfy market demand.

88. In contrast, there is no harm in entering an injunction. The people of Massachusetts have been consuming conventional pork for generations. They will not be injured by its continued availability. The public interest strongly favors keeping an affordable and widely enjoyed protein on store shelves and restaurant menus while we wait for the Supreme Court to rule.

## COUNT I
## Declaratory and Injunctive Relief

89. The forgoing paragraphs 1-88 are incorporated by reference as paragraphs 1-88 of Count I.

90. An actual controversy has arisen concerning the constitutionality of the Pork rules.

91. A state law will be deemed to run afoul of Congresses' exclusive power "[t]o regulate Commerce * * * among the several States" if its "practical effect" is to "'control commercial] conduct beyond the boundaries of the State.'" *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)). Whether a state law "is addressed only to [in-state] sales is irrelevant if the

'practical effect' of the law is to control" conduct in other states. *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 583 (1986).

92. A state law also is unconstitutional if it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

93. The Pork Rules' practical effects are extraterritorial.

94. To make matters worse, MDAR has issued official guidance interpreting the Pork Rules to apply to pork that is not even destined for consumption in Massachusetts if it passes through the hands of a Massachusetts distributor.

95. Thus, in the official opinion of the agency authorized to interpret the Pork Rules, Massachusetts law controls how meat is farmed out-of-state even when its consumed out-of-state.

96. The Pork Rules place a burden on interstate commerce that is clearly excessive in relation to the putative local benefits.

97. The Pork Rules are in direct conflict with the laws of other states. Ohio regulations permit sow farmers in that state to confine sows in breeding pens post-weaning until a new pregnancy is confirmed, Ohio Admin. Code § 901:12-8-02(G)(4), (5), a practice that the Pork Rules forbid. Colorado allows its farmers to confine pregnant sows in individual stalls for 12 days before farrowing. Colo. Rev. Stat. § 35-50.5-102(1)(b). Rhode Island allows a 14-day confinement. Rhode Island Stat. § 4-1.1-4(7).

98. The Pork Rules deprive Plaintiffs' members of the rights, privileges, and immunities secured by the Commerce Clause of the U.S. Constitution and principles of interstate federalism embodied in the Constitution's structure.

99. MDAR has also taken the position that the Pork Rules apply to sales to the federal government that occur in Massachusetts.

100. Plaintiffs' members stand to suffer injury as a result of the Pork Rules.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs Massachusetts Restaurant Association, HospitalityMaine, New Hampshire Lodging & Restaurant Association, Rhode Island Hospitality Association, the Restaurant Law Center, and the National Pork Producers Council respectfully request the following relief:

A. A preliminary injunction prohibiting the Massachusetts Attorney General and the Massachusetts Department of Agricultural Resources from enforcing M.G.L. c. 129 App. § 1-3(C), 330 CMR § 35.04(1)(c), and the official guidance interpreting same, until at least thirty (30) days after the Supreme Court of the United States issues its decision in *Nat'l Pork Producers Council v. Ross,* No. 21-468, *cert. granted*, 142 S. Ct. 1413 (U.S. Mar. 28, 2022);

B. A permanent injunction prohibiting the Massachusetts Attorney General and Massachusetts Department of Agricultural Resources from enforcing M.G.L. c. 129 App. § 1-3(C) and 330 CMR § 35.04(1)(c);

C. Declaratory judgment that M.G.L. c. 129 App. § 1-3(C) is unconstitutional; and

D. Declaratory judgment that 330 CMR § 35.04(1)(c) is unconstitutional.

| | |
|---|---|
| Respectfully submitted, | Respectfully submitted, |
| **ALL PLAINTIFFS,** | **PLAINTIFF NATIONAL PORK PRODUCERS COUNCIL,** |
| by their counsel, | by its counsel, |
| */s/ Robert M. Shaw* | */s/ Michael C. Formica* |
| Jeremy M. Sternberg, BBO No. 556566 | Michael C. Formica* |
| Robert M. Shaw, BBO No. 669664 | NATIONAL PORK PRODUCERS COUNCIL |
| HOLLAND & KNIGHT LLP | 122 C Street, N.W. Suite 875 |
| 10 St. James Ave. | Washington, DC 20001 |
| Boston, MA 02116 | 202-347-3600 |
| 617-523-2700 | *formicam@nppc.org* |
| *jeremy.sternberg@hklaw.com* | *Motion for admission *pro hac vice* forthcoming. |
| *robert.shaw@hklaw.com* | |
| Charles E. Borden* | **PLAINTIFF RESTAURANT LAW CENTER**, |
| HOLLAND & KNIGHT LLP | |
| 800 17th Street N.W., Suite 1100 | by its counsel, |
| Washington, DC 20006 | |
| 202-469-5461 | |
| *charles.borden@hklaw.com* | */s/ Angelo I. Amador* |
| *Motion for admission *pro hac vice* forthcoming. | Angelo I. Amador* |
| | RESTAURANT LAW CENTER |
| | 2055 L Street, N.W., Suite 700 |
| | Washington, DC 20036 |
| | 202-331-5913 |
| | *aamador@restaurant.org* |
| | *Motion for admission *pro hac vice* forthcoming. |

DATED: August 3, 2022