**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS RESTAURANT ASSOCIATION, HOSPITALITYMAINE, NEW HAMPSHIRE LODGING & RESTAURANT ASSOCIATION, RHODE ISLAND HOSPITALITY ASSOCIATION, RESTAURANT LAW CENTER, and the NATIONAL PORK PRODUCERS COUNCIL, <br><br>  Plaintiffs, <br><br> v. <br><br> MAURA HEALEY, in her Official Capacity as the Attorney General of Massachusetts, and JOHN LEBEAUX, in his Official Capacity as Commissioner of the Massachusetts Department of Agricultural Resources, <br><br>  Defendants. | Civil Action No. 22-cv-11245 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Massachusetts Restaurant Association, HospitalityMaine, New Hampshire Lodging & Restaurant Association, Rhode Island Hospitality Association, Restaurant Law Center, and the National Pork Producers Council (collectively, "Plaintiffs") respectfully submit this Memorandum of Law in support of their Emergency Motion for Preliminary Injunction. The Attorney General of Massachusetts and the Department of Agricultural Resources ("MDAR") should be enjoined from enforcing M.G.L. c. 129 App. §§ 1-3(C), 1-6, 330 CMR § 35.04(1)(c), and the official guidance interpreting same[1] (the "Pork Rules") until the Supreme Court of the United States rules in a constitutional challenge to a materially identical California statute. Urgent relief is needed because the new law is scheduled to take effect on August 15, 2022.

## INTRODUCTION

The Pork Rules resulted from a ballot initiative that, among other things, required an increase in the size of enclosures traditionally used in commercial pig farming. They apply to all pigs and their offspring whose whole pork meat is ultimately sold in, or distributed through, Massachusetts. The few small farms that raise pigs in here in the Commonwealth do not utilize the enclosures targeted by the Pork Rules. Accordingly, the law's overt aim and only practical effect is the regulation of out-of-state farming practices, particularly those in pork-producing regions such as Iowa, North Carolina, Minnesota, Missouri, and Indiana. To make matters worse, the statute's reach is not limited to pork consumed in-state. According to official guidance issued just weeks ago, meat from a conventionally raised pig from North Carolina destined for the Maine market would violate the law if it merely passes through the hands of a Massachusetts distributor.

---

[1] "33 CMR 35.00 – FAQ," Mass. Dept. of Agricultural Resources, July 11, 2022 (available at *https://tinyurl.com/2tkyw54p*) (last accessed Aug. 2, 2022).

Accordingly, the Pork Rules raise an important, and undeniably thorny, constitutional question: can Massachusetts prohibit the distribution and sale of conventionally farmed pork from other states consistent with the dormant Commerce Clause?

The Supreme Court will soon provide essential guidance. It granted certiorari to an appeal from the United States Court of Appeals for the Ninth Circuit making a dormant Commerce Clause challenge to a California ballot initiative that also outlawed the sale of pork from pigs born to sows housed in conventional-sized pens. *See National Pork Producers Council, et al. v. Karen Ross, et al*., No. 21-468 (U.S.). Argument is scheduled for October 11, 2022, so a decision is expected at approximately the end of this year and no later than June 2023. The Pork Rules should not be enforced while the Supreme Court's ongoing review leaves their constitutionality in very serious doubt.[2]

As it stands today, many sows are not housed in compliance with the Pork Rules. In particular, many American farmers keep sows in smaller individual pens during the period between weaning and confirmation of pregnancy, for food safety as well as animal health and welfare reasons. With the Pork Rules under a constitutional cloud, few, if any, of these farmers will opt to bare the significant costs renovating their facilities and changing their practices to comply with the new law. Even if they did, the extremely complex pork supply chain cannot presently differentiate between a compliant and non-compliant hog alive today. This is unsurprising given that the first regulations and guidance interpreting the law were issued only weeks ago, roughly two and a half years after the deadline set by the voters.

---

[2] If anything, the Massachusetts Pork Rules are more offensive to the dormant Commerce Clause than the California regime. *See*, pp. 18-19, *infra*.

Thus, if the Pork Rules abruptly go into effect on August 15, 2022, conventionally farmed pork will be forced out of the Massachusetts market and there will be insufficient supply to replace it. Countless farmers, processors, distributers, retailers, and restaurants will suffer irreparable harm in the form of lost sales, lost business relationships, and lost customers. The food supply throughout the region will be disrupted because Massachusetts is home to distribution centers serving other New England states and MDAR has asserted, with a mere 35 days' notice, that the Pork Rules will apply to meat merely distributed through this state.

In contrast, there is no harm in entering an injunction. The people of New England have consumed conventional pork for generations and they will not be injured by its continued availability. The public interest strongly favors keeping an affordable and widely enjoyed protein on store shelves and restaurant menus while we await the Supreme Court's decision.

## FACTUAL BACKGROUND

### A.  The Plaintiffs.

The Plaintiffs are six not-for-profit trade associations. The National Pork Producers Council ("NPPC") is an agricultural organization representing the interests of the $28-billion-a-year United States pork industry. *See* Declaration of Bryan Humphreys attached as Exhibit 1. Its members include pig farmers as well as the pork supply chain and associated businesses such as veterinarians, packers and processors, and related companies. *Id*. The Restaurant Law Center ("RLC") serves as the national voice of America's restaurants in the courtroom advancing the policy interests of the industry. *See* Declaration of Angelo Amador attached as Exhibit 2. The Massachusetts Restaurant Association, HospitalityMaine, New Hampshire Lodging & Restaurant Association, and the Rhode Island Hospitality Association represent the foodservice industries in their respective states. *See* Declarations of Steve Clark, Matt Lewis, Mike Somers, and Dale Venturini attached as Exhibits 3, 4, 5, and 6.

3

**B.  The Pork Rules.**

The statute at issue, M.G.L. c. 129 App. § 1-3(C), makes it unlawful "for a business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any… Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." "Confined in a cruel manner" is defined as "confining… a breeding pig in a manner that prevents the animal from laying down, standing up, fully extending the animal's limbs or turning around freely." M.G.L. c. 129 App. § 1-5. Each violation of the Act is punishable by a civil fine not to exceed $1,000. M.G.L. 129 App. § 1-6. The Attorney General of Massachusetts has exclusive enforcement authority. *Id*.

By the terms of the ballot initiative, voters gave the pork industry two years to adapt to regulations interpreting the new law. In particular, they voted to require the Attorney General to issue regulations for the act's implementation "on or before January 1, 2020" and set January 1, 2022 as the effective date of the statute. M.G.L. c. 129 App. §§ 1-10, 1-11 (pre-Dec. 22, 2021).

The Attorney General did not meet this deadline. Instead, in late December, 2021, the statue was amended to transfer rulemaking authority to the Massachusetts Department of Agricultural Resources ("MDAR") and to give it six additional months to promulgate regulations. M.G.L. c. 129 App. §§ 1-10, 1-11 (post-Dec. 22, 2021). The effective date of the Pork Rules was then set for August 15, 2022. M.G.L. c. 129 App. § 1-12.

So, instead of two years, the pork industry has been given roughly eight weeks to adapt. On June 10, 2022, MDAR promulgated regulations that require for the first time that breading pigs must always be able to turn around "without touching the side of an Enclosure or another animal." 330 C.M.R. § 35.02 (emphasis added). It also explained for the first time what

4

particular kinds of certification (and from whom) are required to demonstrate compliance with the law. 330 C.M.R. § 35.05.

Then, on July 11, 2022, MDAR issued official guidance interpreting its definition of "Sale" as the term is used 330 CMR 35.02. It explained that an out-of-state company that sells pork wholesale to a Massachusetts distributor would be required to comply with the Pork Rules <u>even if the Massachusetts company only distributes out-of-state</u>.[3]

### C. California's Proposition 12 and the Supreme Court's Pending Review.

The Pork Rules are materially identical to a California law adopted through a ballot initiative referred to as "Proposition 12." That statute prohibits the sale of pork born to a sow confined in a way that prevents her "from lying down, standing up, fully extending the animal's limbs, or turning around freely." Cal. Health & Safety Code § 25991.

Plaintiff NPPC filed a lawsuit in the United States District Court for the Southern District of California challenging the constitutionality of Proposition 12. In particular, it sought a declaration that the California law violated the dormant Commerce Clause of the United States Constitution. *Nat'l Pork Producers Council v. Ross*, 456 F. Supp. 3d 1201, 1204 (S.D. Cal. 2020), *aff'd*, 6 F.4th 1021 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 1413 (2022). The District Court and Ninth Circuit both refused to grant relief, holding that — under Ninth Circuit precedent — California could require out-of-state pork producers to make massive alterations to their business practices as the price of accessing the California market. *Id*. The Ninth Circuit ruled that the requirements imposed by Proposition 12 "apply to both California entities and out-of-state entities, and merely impose a higher cost on production, rather than affect interstate

---

[3] "33 CMR 35.00 – FAQ," Mass. Dept. of Agricultural Resources, July 11, 2022 (available at https://tinyurl.com/2tkyw54p) (last accessed Aug. 2, 2022).

commerce." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1029 (9th Cir. 2021), *cert. granted*, 142 S. Ct. 1413 (2022).

On September 27, 2021, NPPC filed the petition for writ of certiorari attached as Exhibit 7 (the "Petition"). As explained therein, while Proposition 12 might appear on its face to apply neutrally to farms located both inside and outside of the state, California produces little pork. Ex. 7., pp. 5-6. In fact, the state imports 99.87% of the pork that it consumes. *Id*., p. 8. Accordingly, the practical effects of Proposition 12 are almost entirely extraterritorial. *Id*., pp. 8-9. In addition, NPPC argued, the law imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Id*., p. 31.

The Supreme Court granted certiorari on March 28, 2022. Argument is set for October 11, 2022. A decision is expected at roughly the end of 2022, and in any event no later than the end of the Supreme Court's term in June 2023. *Lee Epstein et. al., The Best for Last: The Timing of U.S. Supreme Court Decisions*, 64 Duke L.J. 991, 993 (2015) ("The Court usually issues its decision within three months of oral argument.")

In addition to a number of industry and advocacy groups, NPPC's appeal enjoys amicus support from the Biden administration. The United States Solicitor General submitted a brief calling for the reversal of the Ninth Circuit and asking the Supreme Court to find that NPPC's complaint states a claim that "Proposition 12 is unconstitutional under *Pike* [*v. Bruce Church, Inc*., 397 U.S. 137 (1970)]." *See* Brief Amicus Curiae for the Dep't of Justice Supporting Petitioners in *NPPC v. Ross*, No. 21-468 (Jun. 2022). Twenty-six states have also provided amicus support.

In recognition of the difficulty and expense of compliance, a California court entered an injunction prohibiting Proposition 12 from coming into effect until 180 days following the state's

enactment of regulations. *Cal. Hispanic Chambers of Commerce et. al. v. Ross et. al.*, Case No. 34-2021-80003765 (Supp. Ct. Cal., Sacramento Jan. 24, 2022), attached as Exhibit 8. California has not yet promulgated rules, so the injunction is in effect.[4] The statute has yet to be enforced.

### D. The Complexity of the Pork Industry Makes Compliance Very Difficult.

Massachusetts has no pork industry to speak of. *See* Declaration of Casey Gallimore attached as Exhibit 9, ¶ 3. While there are a few farms that raise pigs in the state, they are either demonstration farms or small-scale operations offering artisanal products, mostly directly to consumers. *Id*. They do not utilize the enclosures outlawed by the Pork Rules. *Id*. Massachusetts does, however, have several large pork distribution hubs that serve the New England market. *Id*.

Almost all of the pork consumed in Massachusetts comes from out-of-state. *Id*. Iowa, Minnesota, North Carolina, Illinois, Indiana, and Missouri are the largest pork producers, together accounting for the lion's share of American production. *Id*., ¶ 5.

Many of the sows commercially farmed in the United States are housed in enclosures that do not comply with the Pork Rules. *Id*., ¶ 11. In particular, farmers traditionally keep sows in smaller individual pens during the period between weaning and confirmation of pregnancy. *Id*. This is done for animal health and welfare reasons. *Id*. Sows in group housing can experience more injuries and fatalities than sows housed in breeding stalls because they are exposed to aggression. *Id*. Providing health care and critical nutrients to pregnant sows is often more difficult in group settings. *Id.*

Producing Massachusetts-compliant pork would require many farmers to change their business practices and make physical renovations to their production facilities. *Id*., ¶ 20. This

---

[4] Before the entry of the California injunction, a number of producers made it clear that they would be forced to withdraw from the California market if the law were to take effect. *See, e.g.*, *https://www.bloomberg.com/news/articles/2021-12-17/california-s-new-pig-law-prompts-meatpacker-to-halt-pork-sales* (last accessed Aug. 2, 2022).

would be expensive and time-consuming. *Id.*, ¶ 21. Even if farms did renovate in an effort to comply with the Pork Rules, the complex pork supply chain is unequipped to identify compliant pigs among those alive today. *Id.*, ¶ 19.

Sometimes piglets are raised to market weight on the farm on which they were born. But often, after about 20 days, they are weaned and then transferred to a nursery farm. *Id.*, ¶ 5. On average, they will stay at the nursery farm for about six to eight weeks. *Id.* Afterward, they will travel again to a finishing farm, where they will stay for another 3½ or 4 months before heading to market. *Id.* Overall, the process lasts about six months. *Id.* With pigs changing hands so many times, no one farmer can attest to the use of Massachusetts-size pens at each step of the way.

The supply chain only becomes more complex once the hogs reach market weight and are shipped to a slaughter facility. *Id.*, ¶ 6. These typically receive hogs from hundreds of farms, both independent and large-scale, spread across an area of thousands of square miles. *Id.* The hogs that arrive at a particular pork slaughter facility come from farms providing a wide variety of living conditions to the sows and market animals under their care. *Id.* Upon arrival, the hogs are moved into one or more pens of various sizes. *Id.*, ¶ 7. Slaughter is then completed primarily via a single production line at the pork processing facility. *Id.* Very few pork slaughter facilities in the United States have more than one production line, so pigs from all over a region end up funneled through that one line, becoming indistinguishable. *Id.*

After the pork is processed, it is packaged, labelled, and stored at the processing facility, and then shipped to one or more distributors. *Id.*, ¶ 8. There could be many different distributors, wholesalers, resellers, or others who trade these commodity products and take possession and control of any one cut of pork during its journey from the plant to the dinner plate. *Id.* Finally, the pork is shipped to institutions, retailers, and restaurants. *Id.*

There are, therefore, a minimum of seven steps in the American pork supply chain. *Id*., ¶ 9. The pigs must be (1) born/weaned, (2) raised to market weight, (3) shipped to slaughter facilities, (4) processed, (5) packaged, (6) stored, and (7) shipped again. *Id*. For this essential reason, compliance with the Pork Rules is not merely a matter of changing the size of pens, it is the far more complex task of taking a supply chain developed to provide a commodity and reconfiguring it to segregate Massachusetts meat at each step of way. *Id*., ¶¶ 9, 21-29.

The MDAR guidance issued on July 11, 2022 that explained for the first time that Pork Rules will apply to the millions of hogs alive on August 15, 2022, with compliance assessed by reference to the post-August 15, 2022 living conditions of those hog's mothers. *Id*., ¶ 19. Thus, in order to identify Massachusetts-compliant pork, a meatpacker would have to know which producer currently owns the sow that birthed a particular hog and determine whether that producer took steps to ensure that the sow's enclosure complies with the Pork Rules after August 15, 2022. *Id*. The pork supply chain is presently unequipped to make this assessment. *Id*. As a result, the meat from the vast majority of the hogs alive today will be ineligible for sale in Massachusetts because it is all but impossible to draw the required connection between a given market pig and the current living conditions of its mother. *Id*. A far more sensible approach to implementing the Pork Rules would have been to have them apply only to pigs born after the date the rules take effect. *Id*. [5] Segregation of compliant and non-compliant pork through the supply chain should start at birth. *Id*.

---

[5] MDAR's interpretation also has the effect of shifting the effective compliance date for farmers back in time. It takes roughly ten months from breading to raise a finished market hog (a sow is pregnant for roughly four months and a piglet grows to market size in roughly six months). Accordingly, a farmer who wanted to be able to supply pork to Massachusetts as of August 15, 2022 would have had to have moved sows into housing compliant with the Pork Rules in October 2021 — more than 10 months *before* the implementation date of the law, and more than 8 months *before* regulations defining compliant housing were issued.  In contrast, California

**ARGUMENT**

The usual factors to be considered in deciding a motion for preliminary junction are as follows:

> first, the likelihood that the party requesting the injunction will succeed on the merits; second, the potential for irreparable harm if the injunction is denied; third, the hardship to the nonmovant if enjoined compared to the hardship to the movant if injunctive relief is denied; and fourth, the effect of the court's ruling on the public interest.

*Francisco Sanchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

By far the most important of these elements is whether the movant is likely to succeed on the merits. The First Circuit has described it as the "touchstone," "sine qua non," and "main bearing wall" of the preliminary injunction analysis. *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir.1998); *Ryan v. ICE*, 974 F.3d 9, 18 (1st Cir. 2020); *W Holding Co. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014).

In fact, the First Circuit also explained that a finding of likelihood of success on the merits in the context of a constitutional challenge to a statute is the end of the preliminary injunction inquiry because "a conclusion that a particular requirement is probably unconstitutional necessarily entails a decision as to the other preliminary injunction criteria as well." *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1023 (1st Cir. 1981); *Philip Morris v. Harshbarger*, No. 98-11599, 1997 U.S. Dist. LEXIS 21012 (D. Mass. Dec. 10, 1997); *see also* 11A C. Wright, A. Miller, Federal Practice and Procedure § 2948.1 at 161 (2d ed. 1995) ("most courts hold that no further showing of irreparable injury is necessary" when the constitutionality of a statute is at issue).

---

sensibly avoided this retroactivity problem by having Proposition 12's rules apply as of birth, not harvest.  *See https://www.cdfa.ca.gov/AHFSS/pdfs/prop_12_faq.pdf* (last accessed Aug 3, 2022).

Accordingly, an injunction should issue if the Court finds a likelihood of success on

merits. For the sake of thoroughness, however, the following addresses each of the four factors.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The Constitution gives Congress the power "[t]o regulate Commerce with foreign

Nations, and among the several States, and with the Indian Tribes[.]" U.S. Const. art. I, § 8, cl. 3.

This provision affirmatively granting Congress the authority to legislate in the area of interstate

commerce "has long been understood, as well, to provide 'protection from state legislation

inimical to the national commerce [even] where Congress has not acted....'" *Nat'l Foreign Trade*

*Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999) (*quoting Barclays Bank PLC v. Franchise*

*Tax Bd. of Cal*., 512 U.S. 298, 310 (1994)), *aff'd sub nom. Crosby v. Nat'l Foreign Trade*

*Council*, 530 U.S. 363 (2000).

"This negative command, known as the dormant Commerce Clause, prohibits states from

acting in a manner that burdens the flow of interstate commerce." *Pharm. Rsch. & Mfrs. of Am.*

*v. Concannon*, 249 F.3d 66, 79 (1st Cir. 2001), *aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v.*

*Walsh*, 538 U.S. 644 (2003) (*citing Okla. Tax Comm'n v. Jefferson Lines, Inc*., 514 U.S. 175,

179–80, 115 S.Ct. 1331 (1995)).

Through this lawsuit, Plaintiffs seek a declaratory judgment that the Massachusetts Pork

Rules violate the dormant Commerce Clause deprive Plaintiffs' members of the rights,

privileges, and immunities secured by the Commerce Clause of the U.S. Constitution and

principles of interstate federalism embodied in the Constitution's structure. Their likelihood of

success is demonstrated in two ways: first, by the fact that the Pork Rules' effects are entirely

extraterritorial and place a burden on interstate commerce that is clearly excessive in relation to

the putative local benefits; second, by the Supreme Court's grant of certiorari in a Commerce

Clause challenge to California's materially identical statute.

### A.  The Pork Rules Are Unconstitutional.

Plaintiffs are likely to succeed on the merits because the Pork Rules violate two

independent and well-established aspects of the dormant Commerce Clause. A state law will be

deemed to run afoul of Congresses' exclusive power "[t]o regulate Commerce * * * among the

several States" if its "practical effect" is to "'control [commercial] conduct beyond the

boundaries of the State.'" *Healy v. Beer Inst., Inc*., 491 U.S. 324, 336 (1989)). A state law also is

unconstitutional if it imposes a burden on interstate commerce that is "clearly excessive in

relation to the putative local benefits." *Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970).

### i.     The Practical Effect Of the Pork Rules Is To Control Commercial Conduct in Other States

A state statute is per se invalid under the dormant Commerce Clause when it "regulates

commerce wholly outside the state's borders or when the statute has a practical effect of

controlling conduct outside of the state." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 311

(1st Cir. 2005) (*citing Concannon*, 249 F.3d at 79); *see also Healy*, 491 U.S. at 335. In *Healy*, the

Supreme Court explained that the focus on the "extraterritorial effects of state economic

regulation" "reflect[s] the Constitution's special concern both with the maintenance of a national

economic union unfettered by state-imposed limitations on interstate commerce and with the

autonomy of the individual States within their respective spheres." 491 U.S. at 335-336. Those

"special concerns" are equally implicated whether a state's regulation directly or indirectly

affects conduct outside of the regulating state because the "practical effect" can be the same in

either instance. *See Baldwin*, 294 U.S. at 524. Whether a state law "is addressed only to [in-state]

sales is irrelevant if the 'practical effect' of the law is to control" conduct in other states. *Brown-Forman Distillers Corp. v. New York State Liquor Auth*., 476 U.S. 573, 583 (1986).

Massachusetts produces hardly any pork and none utilizing the enclosures outlawed by the Pork Rules. Ex. 9, ¶ 3. Accordingly, the only "practical effect" of the new law would be to alter farming practices elsewhere. "Practical effects" are evaluated by "considering the consequences of the statute itself" and "how [it] may interact with the legitimate regulatory regimes of other States." *Healy*, 491 U.S. at 336. The Pork Rules are in direct conflict with the laws of other states. Ohio regulations permit farmers in that state to confine their sows in breeding pens post-weaning until a new pregnancy is confirmed, Ohio Admin. Code § 901:12-8-02(G)(4), (5), a practice that the Pork Rules expressly forbid. Colorado allows its farmers to confine pregnant sows in stalls for 12 days before farrowing. Colo. Rev. Stat. § 35-50.5-102(1)(b). Rhode Island allows for a 14-day confinement. Rhode Island Stat. § 4-1.1-4(7).[6]

Plaintiffs recognize that some consumers and voters in Massachusetts support the spirit of the statute at issue, but the Commonwealth cannot decide for Ohio, Colorado, Rhode Island, and other states what constitutes a humane pen size, any more than those states could decide for Massachusetts the most environmentally sensitive approach to scallop fishing or the size of a humane lobster trap. If states were allowed to build barriers to trade based on their unique value judgments, the national economy would become balkanized, inefficient, and uncompetitive. The Commerce Clause "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations

---

[6] *See Nevada v. Hall*, 440 U.S. 410, 443 (1979) (Rehnquist, J., dissenting ) (observing that "[t]he federal system as expressed in the Constitution—with the exception of representation in the House—is built on notions of state parity. No system is truly federal otherwise.")

among the Colonies and later among the States." *Hughes* v. *Oklahoma*, 441 U.S. 322, 325-326 (1979). Thus, "the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce" is a "special concern" of the Constitution. *Healy*, 491 U.S. at 335-336; *see Tennessee Wine & Spirits Retailers Ass'n* v. *Thomas*, 139 S. Ct. 2449, 2459-2460 (2019) (dormant Commerce Clause "preserves a national market for goods and services"); *Camps Newfound/ Owatonna, Inc.* v. *Town of Harrison, Me.*, 520 U.S. 564, 596 (1997) (Scalia, J., dissenting) ("We have often said that the purpose of our negative Commerce Clause jurisprudence is to create a national market").

Most egregiously, MDAR issued guidance interpreting the Pork Rules to apply to pork that is not even destined for consumption in Massachusetts.[7] It was asked the following question: "My company sells whole pork meat and whole veal meat wholesale to a Massachusetts company who only sells their products out of state (outside of Massachusetts), do the regulations apply to us?" *Id*. MDAR responded, "Yes… In this example, the buyer is in Massachusetts and takes physical possession of the pork and veal in Massachusetts. Therefore, the regulation applies." *Id*. This is no mere comment. Massachusetts courts are generally required to give deference to agency guidance. *See Dixon v. City of Malden*, 464 Mass. 446, 450 (2013).

Thus, in the official opinion of the agency authorized to interpret the Pork Rules, <u>Massachusetts law controls how meat is farmed out-of-state even when its consumed out-of-state</u>. There is no Massachusetts connection to this product other than the fact that it happens to pass through the hands of a Massachusetts distributor. This is a quintessential example of a state unlawfully trying to interfere with the free flow of commerce between *other* states. *Brown-*

---

[7] "33 CMR 35.00 – FAQ," Mass. Dept. of Agricultural Resources, July 11, 2022 (available at https://tinyurl.com/2tkyw54p) (last accessed Aug. 2, 2022).

*Forman Distillers Corp.*, 476 U.S. 573 at 585 ("The Commerce Clause operates with full force whenever one State attempts to regulate the transportation and sale of alcoholic beverages destined for distribution and <u>consumption in a foreign country or another State</u>.") (Internal citation omitted, emphasis added). The Commerce Clause "permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited." *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982). When Massachusetts dictates how pork consumed in other states is farmed in other states it is *directly*, not incidentally, regulating interstate commerce.[8]

Massachusetts residents are, of course, free to give voice to their moral judgments through their purchasing decisions. They can elect to buy pork raised in any number of ways. They could pass a law controlling the way pigs are farmed in Massachusetts. They could require labeling and other disclosures. They cannot, however, erect a barrier to trade by imposing their personal definition of humane on other states. They have no say in how a North Carolina farmer raises pigs that are destined for consumption in Rhode Island, New Hampshire, or Maine.

### ii.    The Burden That The Pork Rules Impose on Other States Is Clearly Excessive In Relation to the Putative Benefits to Massachusetts.

Even when a state statute otherwise regulates evenhandedly, it will not be upheld if the burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142.

As explained at pp. 7, *supra*, the Pork Rules would require farmers to renovate their facilities and change the way they care for their animals. It would require the pork supply chain

---

[8] MDAR has even taken the position that the Pork Rules apply to federal government's procurement decisions in Massachusetts. These include pork sales to the United States Department of Agriculture's National School Lunch program, federal offices, military bases, a federal prison, and other facilities. Such interference with the operation of federal agencies raises additional constitutional questions.  *See* e-mail from MDAR attached as <u>Exhibit 10</u>; *see also North Dakota v. U.S.,* 495 U.S. 423 (1990).

to do something it was not created to do: differentiate between ordinary meat and meat compliant with one state's laws. *Id*. All of this would be expensive, disruptive, and would take time, especially since there is no practical way to distinguish compliant hogs alive today. Ex. 9, ¶ 19.

These burdens on interstate commerce clearly exceed whatever putative local benefit the Pork Rules may be thought to have. It is unclear that Massachusetts would enjoy any cognizable benefit by the alteration of farming practices in other states. It is also unclear that the Pork Rules would actually advance the animal welfare goals that motivated the ballot initiative. Sows in group housing experience more injuries and fatalities than sows housed in breeding stalls because they are exposed to aggression. *See* p. 7, *supra*. It is often more difficult to provide proper nutrition and health case to pregnant sows in group housing. *Id*.

Accordingly, the burdens that the Pork Rules impose on other states greatly outweigh whatever benefit they provide Massachusetts. This is most obviously so when it comes to the ban on distributing non-compliant pork through the Commonwealth. Massachusetts enjoys no benefit when it prevents Rhode Island, New Hampshire, and Maine from importing conventional pork from North Carolina. The burdens the Pork Rules impose on these states are plainly excessive given the lack of benefit to Massachusetts, so Plaintiffs are likely to succeed on the merits.

**B. The Supreme Court Is Very Likely to Reverse the Ninth Circuit and, In Doing So, Invalidate the Pork Rules.**

The Supreme Court usually reverses the cases it decides to review. [9] During the 2021-2022 term, it decided 66 cases and reversed 54 times, resulting in a 81.8% reversal rate. *Id*. In fact, while the Supreme Court reviewed far more cases from the Ninth Circuit than any other, it

---

[9] *See* SCOTUSblog STAT PACK for the Supreme Court's 2021-2022 Term, p. 24 *available at* https://www.scotusblog.com/wp-content/uploads/2022/07/SCOTUSblog-Final-STAT-PACK-OT2021.pdf (last accessed August 3, 2022)

reversed <u>all</u> of them last term — a 100% Ninth Circuit reversal rate. *Id*. On top of this, NPPC's appeal enjoys the strong support of the Biden Administration and a many state governments. For these essential reasons, NPPC is not merely likely to win its appeal. Its chances are excellent.

The issue before the Supreme Court is whether the Ninth Circuit erred in concluding that Proposition 12 comports with the Commerce Clause. Ex. 7, p. i. It cannot find that California's Proposition 12 violates the Commerce Clause, or otherwise does not comport with the principals of federalism embodied in the Constitution, without also implicitly invalidating Massachusetts's Pork Rules. The statutes are the same in all material respects. California prohibits the sale of "[w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner." Cal. Health & Safety Code §§ 25990. Massachusetts prohibits the sale of "[w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner."[10] M.G.L. c. 129 App. § 1-3(C). The drafters of Proposition 12 must have based the California law on the previously enacted Massachusetts statue because the only difference in their core provision is a pronoun.

If anything, the Massachusetts' Pork Rules are *more* offensive to the Commerce Clause than California's Proposition 12. There are a small number of farms in California that would have to make alterations to their practices if Proposition 12 takes effect. Ex. 7, p. 7. In contrast, no Massachusetts farm uses the enclosures outlawed by the Pork Rules. Accordingly, the effects

---

[10] Both statues also define "cruel manner" in the same way. *Compare* Cal. Health & Safety Code §§ 25990, 25991 (confining in a way that prevents "lying down, standing up, fully extending the animal's limbs, or turning around freely.") *with* M.G.L. c. 129 App. § 1-5 (same).

of California's statute are *almost completely* exterritorial, while the effects of the Massachusetts Pork Rules are *entirely* extraterritorial. *Id.*

Moreover, MDAR has taken the position that Massachusetts law controls how meat consumed out-of-state is farmed out-of-state if it happens to pass through the hands of a Massachusetts distributor. *See* pp. 5, 14, *supra*. This is an exceptionally extraterritorial exertion of state law. Even California has not gone that far. Its proposed regulations reach only "whole pork meat for human consumption in the state." Proposed 10 Cal. Code Regs. § 1322.1

Federal courts have enjoined state laws from taking effect where, as here, the Supreme Court granted certiorari to consider the constitutionality of a similar law from another state. For example, the Supreme Court granted certiorari to review the Fifth Circuit's decision in *Jackson Women's Health v. Dobbs*, 945 F.3d 265 (5th Cir. 2019), which had found a Mississippi law banning abortions after 15 weeks to be unconstitutional. The United States District Court for the Western District of Kentucky then entered in injunction prohibiting the enforcement of a similar Kentucky law pending the outcome of the Supreme Court's review. *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, No. 3:22-CV-198-RGJ, 2022 WL 1597163, at *18 (W.D. Ky. May 19, 2022). It explained:

> The United States Supreme Court is expected to soon render a decision in *Dobbs* regarding the constitutionality of a Mississippi law that banned abortion after 15 weeks. *See Dobbs*, 945 F.3d 265. The issue in *Dobbs* is identical to the issue in this case. Although the parties consented to a stay in the *EMW* Case, the Court has authority to stay provisions of a law and related litigation pending a decision from  a  higher Court. *See Trump  v. Hawaii*, 138 S. Ct. 542, 199 L. Ed. 2d 382 (2017); *Charities v. Gordon*, No. 1:19-CV-286, 2020 U.S. Dist. LEXIS 246424, 2020 WL 7872348, at *2 (W.D. Mich. May 5, 2020) ("In contrast, the Supreme Court's decision in *Fulton* [*v. City of Philadelphia*, 922

F.3d 140 (3d. Cir. 2019)] will provide significant guidance, if not a controlling rule of federal law.").

*Id.* The Court should reach the same result here.[11]

## II.   PLAINTIFFS STAND TO SUFFER IRREPARABLE HARM UNLESS THE PORK RULES IS ENJOINED.

As the First Circuit explained, once a court finds that a plaintiff making a constitutional challenge to a statute is likely to succeed on the merits, the preliminary injunction analysis ends there and the injunction should issue. *Planned Parenthood League of Mass.*, 641 F.2d at 1023 ("a conclusion that a particular [legal] requirement is probably unconstitutional necessarily entails a decision as to the other preliminary injunction criteria as well."). A plaintiff subject to an unconstitutional law is forced into a no-win dilemma where irreparable harm is inevitable if the statute is not enjoined. *Ex parte Young, 209 U.S. 123, 145-48, 52 L. Ed. 714, 28 S. Ct. 441 (1908)* ("the unavailability of an adequate opportunity to challenge the law before being subjected to it amounts to irreparable harm"); *Philip Morris v. Harshbarger*, No. 98-11599, 1997 U.S. Dist. LEXIS 21012 (D. Mass. Dec. 10, 1997); *see also* 11A C. Wright, A. Miller, Federal Practice and Procedure § 2948.1 at 161 (2d ed. 1995).

In any event, the Plaintiffs are trade associations representing the United States pork industry, restaurants nationwide, and the foodservice industries in Massachusetts, Maine, New Hampshire, and Rhode Island. Their members stand to be irreparably harmed if forced to stop offering conventionally farmed pork on August 15, 2022. *See* Ex. 1, ¶¶ 6-7, Ex. 2, ¶¶ 4-8, Ex. 3, ¶¶ 7-8, Ex. 4, ¶¶ 6-7, Ex. 5 ¶¶ 6-7, Ex. 6 ¶¶ 6-8. They should not be made to comply with a law

---

[11] Fed. R. App. P. 41 calls for the mandate of a circuit court to be stayed when a petition for writ of certiorari merely "present[s] a substantial question." The rule maintains the status quo while the Supreme Court considers whether to accept a case. The importance of maintaining the status quo is only greater once the Supreme Court actually grants certiorari.

that the Supreme Court may soon invalidate. *Id*. The enforcement of the Pork Rules only weeks

after MDAR issued regulations and guidance that mandate substantial changes to interstate

supply and distribution chains will cause substantial disruptions that will result in Plaintiffs'

members losing sales, losing relationships with existing vendors, and ultimately losing

customers. *Id*.; *see also* Ex. 9, ¶¶ 11-20.

### III.    THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF.

As explained above, a finding of likelihood of success on the merits in a constitutional

challenge to a statute satisfies all of the criteria for entry of a preliminary injunction. *Planned*

*Parenthood League of Mass.*, 641 F.2d at 1023. This said, entry of the injunction would not

impose a hardship. Conventionally raised pork has been consumed in Massachusetts for

generations. There is no injury to anyone in in preserving the status quo while we wait for the

Supreme Court to rule, especially since a decision is expected soon. *See* pp., 2, 6, *supra*.

### IV.    THE REQUESTED INJUNCTION IS IN THE PUBLIC INTEREST.

As explained at pp. 7-9, *supra*, if the Pork Rules go abruptly into effect it would force

many producers out of the Massachusetts market. With only weeks between MDAR's

promulgation of regulations and guidance and the August 15, 2022 effective date of the statute,

there is simply not enough time for the industry to adapt. *Id*. The supply chain is unequipped to

distinguish between compliant and non-compliant pork alive today. *Id*. Moreover, there is little

incentive for farms to make changes to their business practices and renovations to their facilities

to accommodate Massachusetts when its Pork Rules are under a constitutional cloud. *Id*. For all

of these reasons, we will see bare shelves in supermarkets and outraged consumers on the

evening news if the Pork Rules go into effect on August 15, 2022. The public interest strongly

favors avoiding disruptions to the food supply.

**CONCLUSION**

Wherefore, Plaintiffs Massachusetts Restaurant Association, HospitalityMaine, New Hampshire Lodging & Restaurant Association, Rhode Island Hospitality Association, the Restaurant Law Center, and the National Pork Producers Council respectfully request that this Honorable Court preserve the status quo by enjoining the Attorney General of Massachusetts from enforcing M.G.L. c. 129 App. §§ 1-3(C), 1-6, 330 CMR § 35.04(1)(c), and the official guidance interpreting same, until thirty (30) days following the ruling of the Supreme Court of the United States in *National Pork Producers Council, et al. v. Karen Ross, et* No. 21-468, *cert. granted*, 142 S. Ct. 1413 (U.S. Mar. 28, 2022).

Respectfully submitted,

**ALL PLAINTIFFS,**

by their counsel,

/s/ Robert M. Shaw
Jeremy M. Sternberg, BBO No. 556566
Robert M. Shaw, BBO No. 669664
HOLLAND & KNIGHT LLP
10 St. James Ave.
Boston, MA 02116
617-523-2700
jeremy.sternberg@hklaw.com
robert.shaw@hklaw.com

Charles E. Borden*
HOLLAND & KNIGHT LLP
800 17th Street N.W., Suite 1100
Washington, DC 20006
202-469-5461
charles.borden@hklaw.com
*Motion for admission *pro hac vice*
forthcoming.

Respectfully submitted,

**PLAINTIFF NATIONAL PORK
PRODUCERS COUNCIL,**

by its counsel,

/s/ Michael C. Formica
Michael C. Formica*
NATIONAL PORK PRODUCERS COUNCIL
122 C Street, N.W. Suite 875
Washington, DC 20001
202-347-3600
formicam@nppc.org
*Motion for admission *pro hac vice*
forthcoming.

**PLAINTIFF RESTAURANT LAW
CENTER,**

by its counsel,

/s/ Angelo I. Amador
Angelo I. Amador*
RESTAURANT LAW CENTER
2055 L Street, N.W., Suite 700
Washington, DC 20036
202-331-5913
aamador@restaurant.org
*Motion for admission *pro hac vice*
forthcoming.

DATED: August 3, 2022

## CERTIFICATE OF SERVICE

I hereby certify that today, August 3, 2022, I caused a true copy of the foregoing to be served by hand and by certified mail on the Office of the Attorney General of Massachusetts and the Massachusetts Department of Agricultural Resources.

/s/ Robert M. Shaw
Robert M. Shaw