Exhibit 7

No. 21-

# In the Supreme Court of the United States

———————

NATIONAL PORK PRODUCERS COUNCIL & AMERICAN
FARM BUREAU FEDERATION,

*Petitioners*,

v.

KAREN ROSS, ET AL.,

*Respondents.*

———————

**Petition for a Writ of Certiorari to the
United States Court of Appeals
for the Ninth Circuit**

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

<table>
<tr><td>

DAN HIMMELFARB
COLLEEN M. CAMPBELL
  *Mayer Brown LLP*
  *1999 K Street, NW*
  *Washington, DC 20006*
  *(202) 263-3000*

</td><td>

TIMOTHY S. BISHOP
  *Counsel of Record*
BRETT E. LEGNER
  *Mayer Brown LLP*
  *71 South Wacker Drive*
  *Chicago, Illinois 60606*
  *(312) 701-7829*
  *tbishop@mayerbrown.com*

</td></tr>
</table>

*Counsel for Petitioners*
*Additional Counsel Listed on Signature Page*

## QUESTIONS PRESENTED

Proposition 12 bans the sale of pork in California unless the sow from which it derived was housed with space allowances that almost no farms satisfy (for good reason). Californians account for 13% of the Nation's pork consumption, but raise hardly any pigs. The massive costs of complying with Proposition 12 fall almost exclusively on out-of-state farmers. And because a single pig is processed into cuts that are sold nationwide in response to demand, those costs will be passed on to consumers everywhere, in countless transactions having nothing to do with California.

The Ninth Circuit acknowledged that petitioners plausibly allege that Proposition 12 has "dramatic upstream effects," requires "pervasive changes to the pork production industry nationwide," and imposes costs that "mostly fall on non-California transactions." Nevertheless—in conflict with other circuits and contrary to the views of *amici* the United States, 20 States, and business groups—it held that petitioners failed to plead a dormant Commerce Clause violation. In doing so, it brushed aside this Court's decisions holding that laws with significant extraterritorial effects violate our federalist scheme, and failed to engage in meaningful balancing under *Pike* v. *Bruce Church, Inc.* The questions presented are:

Whether allegations that a state law has dramatic economic effects largely outside of the state and requires pervasive changes to an integrated nationwide industry state a violation of the dormant Commerce Clause, or whether the extraterritoriality principle described in this Court's decisions is now a dead letter.

Whether such allegations, concerning a law that is based solely on preferences regarding out-of-state housing of farm animals, state a *Pike* claim.

## PARTIES TO THE PROCEEDING AND RULE 29.6 STATEMENT

Petitioners here, plaintiffs-appellants below, are the National Pork Producers Council (NPPC) and the American Farm Bureau Federation (AFBF).

NPPC is an agricultural organization representing the interests of the $26-billion-a-year U.S. pork industry. Its members include pig farmers as well as the entire pork chain and associated businesses such as veterinarians, pork packers and processors, and other allied companies that serve the pork industry. NPPC does not have any parent corporation, and no publicly held corporation owns 10% or more of NPPC.

AFBF is an agricultural organization whose purpose is to improve the conditions of farmers. More than six million families, including farmers who grow and raise virtually every agricultural product in the U.S., are members of AFBF. AFBF does not have any parent corporation, and no publicly held corporation owns 10% or more of AFBF.

Defendants-appellees below were Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture; Sonia Angell, in her official capacity as Director of the California Department of Health; and Xavier Becerra, in his official capacity as Attorney General of California. On July 28, 2021, Sonia Angell was substituted by Tomas Aragon, in his official capacity as Director of the California Department of Public Health, and Xavier Becerra was substituted by Rob Bonta, in his official capacity as Attorney General of California.

Intervenors-defendants-appellees below were the Humane Society of the United States of America;

iii

Animal Legal Defense Fund; Animal Equality; The
Humane League; Farm Sanctuary; Compassion in
World Farming USA; and Compassion Over Killing.

iv

## RELATED PROCEEDINGS

No other case is directly related to the case in this Court within the meaning of Rule 14.1(b)(iii).

A different group of plaintiffs, representing principally the meat packing industry, previously sought to preliminarily enjoin Proposition 12's provisions applicable to the sale of pork and veal. The district court denied the packers' motion for a preliminary injunction, the Ninth Circuit affirmed, and this Court denied certiorari. See *N. Am. Meat Inst.* v. *Becerra*, 420 F. Supp. 3d 1014 (C.D. Cal. 2019), aff'd, 825 F. App'x 518 (9th Cir. 2020), cert. denied, 2021 WL 2637862, No. 20-1215 (U.S. June 28, 2021).

v

# TABLE OF CONTENTS

**Page**

QUESTIONS PRESENTED ........................................ i

PARTIES TO THE PROCEEDING AND
RULE 29.6 STATEMENT .......................................... ii

RELATED PROCEEDINGS ......................................iv

TABLE OF AUTHORITIES................................... viii

OPINIONS BELOW ....................................................1

JURISDICTION ...........................................................1

CONSTITUTIONAL, STATUTORY, AND
REGULATORY PROVISIONS INVOLVED .............1

STATEMENT ...............................................................2

    A. Proposition 12 ....................................................5

    B. The pork production industry ..........................7

        1. Sow housing.....................................................8

        2. Vertical segmentation of pork
           production....................................................9

        3. Processing of a market hog into
           different cuts of pork sold to
           different buyers and locations .................11

    C. Proposition 12's nationwide impact on
       production and pricing ...................................11

    D. The rulings below ...........................................13

REASONS FOR GRANTING THE PETITION .......16

I.  THE NINTH CIRCUIT'S DECISION
    EVISCERATES THE ESSENTIAL
    PROTECTIONS PROVIDED BY THE
    EXTRATERRITORIALITY DOCTRINE. ...........20

vi

**TABLE OF CONTENTS—continued**

**Page**

A. The Ninth Circuit's Decision Conflicts
   With This Court's Precedents Holding
   That The Extraterritoriality Doctrine
   Applies When A State Indirectly Regul-
   ates Transactions Occurring Wholly In
   Other States....................................................21

B. The Circuits Are Split On The Meaning
   Of *Walsh* And The Applicability Of The
   Practical-Effects Test. ...................................26

II. THE NINTH CIRCUIT IMPROPERLY
    NARROWED THE SCOPE OF *PIKE* .................28

CONCLUSION .........................................................33

APPENDICIES

APPENDIX A: Opinion, *National Pork Producers
   Council* v. *Ross*, No. 20-55631 (9th Cir. July 28,
   2021), ECF 70, printed at 6 F. 4th 1021........... 1a

APPENDIX B: Order Granting Defendants' Motion
   to Dismiss and Granting Defendant-Intervenors'
   Motion for Judgment on the Pleadings, *National
   Pork Producers Council* v. *Ross*, No. 19-cv-02324
   (S.D. Cal. Apr. 27, 2020), ECF 37, printed at 456
   F. Supp. 3d 1201 ............................................. 21a

APPENDIX C: Judgment, *National Pork Producers
   Council* v. *Ross*, No. 19-cv-02324 (S.D. Cal. June
   16, 2020), ECF 41 ........................................... 36a

APPENDIX D: *Prevention of Cruelty to Farm
   Animals Act*, Cal. Proposition 12 (Nov. 6, 2018),

vii

**TABLE OF CONTENTS—continued**

**Page**

codified at Cal. Health & Safety Code § 25990 *et seq*................................................................ 37a

APPENDIX E: California Department of Food and Agriculture, *Title 3. Food and Agriculture Proposed Regulations—Animal Confinement* (May 25, 2021), https://www.cdfa.ca.gov/ ahfss/pdfs/regulations/AnimalConfinement1stNo ticePropReg_05252021.pdf ............................. 47a

APPENDIX F: California Department of Food and Agriculture, *Animal Health and Food Safety Services Proposed Regulations—Animal Confinement* (May 25, 2021), https://www.cdfa. ca.gov/ahfss/pdfs/regulations/AnimalConfine- mentText1stNotice_05252021.pdf .................. 99a

APPENDIX G: Complaint for Declaratory and Injunctive Relief and Exhibits A-O, *National Pork Producers Council* v. *Ross*, No. 19-cv-02324 (S.D. Cal. Dec. 5, 2019), ECF 1 ..................... 147a

viii

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ass'n des Eleveurs de Canards et d'Oies*
    *du Quebec* v. *Harris*,
    729 F.3d 937 (9th Cir. 2013)..........................23, 26

*Ass'n for Accessible Medicines* v. *Frosh*,
    887 F.3d 664 (4th Cir. 2018)...............................27

*Baldwin* v. *G.A.F. Seelig*,
    294 U.S. 511 (1935).....................................*passim*

*Bristol-Myers Squibb Co.* v. *Super. Ct. of*
    *Cal.*,
    137 S. Ct. 1773 (2017).........................................19

*Brown-Forman Distillers Corp.* v. *N.Y.*
    *State Liquor Auth.*,
    476 U.S. 573 (1986)...........................16, 22, 24, 25

*C&A Carbone, Inc.* v. *Town of*
    *Clarkston*,
    511 U.S. 383 (1994).......................................23, 31

*Edgar* v. *MITE Corp.*,
    457 U.S. 624 (1982)..............................................23

*Energy & Env't Legal Inst.* v. *Epel*,
    793 F.3d 1169 (10th Cir. 2015).....................23, 26

*Exxon Corp.* v. *Governor of Maryland*,
    437 U.S. 117 (1978)..............................................29

ix

## TABLE OF AUTHORITIES—continued

**Page(s)**

*H.P. Hood & Sons* v. *Du Mond*,
  336 U.S. 525 (1949).............................................20

*Healy* v. *Beer Institute*,
  491 U.S. 324 (1989).....................................*passim*

*Legato Vapors, LLC* v. *Cook*,
  847 F.3d 825 (7th Cir. 2017).........................27, 28

*Online Merchants Guild* v. *Cameron*,
  995 F.3d 540 (6th Cir. 2021)...............................27

*Pharm. Rsch. & Mfrs of Am.* v. *Walsh*,
  538 U.S. 644 (2003).....................................*passim*

*Pike* v. *Bruce Church, Inc.*,
  397 U.S. 137 (1970).....................................*passim*

*S. Dakota* v. *Wayfair, Inc.*,
  138 S. Ct. 2080 (2018).........................................22

*S. Pac. Co.* v. *Arizona*,
  325 U.S. 761 (1945).......................................19, 24

*Ward* v. *United Airlines, Inc.*,
  986 F.3d 1234 (9th Cir. 2021).............................24

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. art. I, § 8, cl. 3 ..........................................1

28 U.S.C. § 1254(1).....................................................1

x

## TABLE OF AUTHORITIES—continued

**Page(s)**

Cal. Health & Saf. Code
   § 25990................................................................1
   § 25990(b)(2).......................................................5
   § 25991(a) ...........................................................8
   § 25993(a) ...........................................................6

Ohio. Admin. Code
   901:12-8-02(G)(4) ...........................................4, 18
   901:12-8-02(G)(5) ...........................................4, 18

## MISCELLANEOUS

CDFA, *Animal Health and Food Safety
   Services Proposed Regulations—
   Animal Confinement* (May 25, 2021),
   https://www.cdfa.ca.gov/ahfss/pdfs/
   regulations/AnimalConfinementText
   1stNotice_05252021.pdf..............................*passim*

CDFA, *Title 3. Food and Agriculture
   Proposed Regulations—Animal
   Confinement* (May 25, 2021),
   https://www.cdfa.ca.gov/ahfss/
   pdfs/regulations/AnimalConfinement
   1stNoticePropReg_ 05252021.pdf................*passim*

Pallotta, *Wins for Animals in the 2018
   Midterm Election*, Animal Legal
   Defense Fund (Jan. 5, 2019)..................................6

ii

**TABLE OF AUTHORITIES—continued**

**Page(s)**

S. Shapiro, K. Geller, T. Bishop, E.
Hartnett & D. Himmelfarb, Supreme
Court Practice (11th ed. 2019)............................32

## PETITION FOR A WRIT OF CERTIORARI

The National Pork Producers Council and American Farm Bureau Federation respectfully petition for a writ of certiorari to review the judgment of the Ninth Circuit.

## OPINIONS BELOW

The Ninth Circuit's decision (App., *infra*, 1a-20a) is reported at 6 F.4th 1021 (9th Cir. 2021). The district court's decision (App., *infra*, 21a-35a) is reported at 456 F. Supp. 3d 1201 (S.D. Cal. 2020).

## JURISDICTION

The judgment of the district court granting defendants' motion to dismiss and intervenors-defendants' motion for judgment on the pleadings was entered on April 27, 2020. App., *infra*, 36a. Petitioners timely appealed. ER15, ECF 42. The judgment of the court of appeals was entered on July 28, 2021. App., *infra*, 2a. This Court has jurisdiction under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL, STATUTORY, AND REGULATORY PROVISIONS INVOLVED

The Commerce Clause authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3.

Proposition 12, codified at Cal. Health & Safety Code § 25990 *et seq.*, is reproduced at App., *infra*, 37a-46a. The California Department of Food and Agriculture's (CDFA) notice of and proposed regula-

tions implementing Proposition 12 are reproduced at App., *infra*, 47a-146a.[1]

### STATEMENT

Proposition 12 makes it a criminal and civil violation to sell pork in California unless the pig it comes from was born to a sow—an adult female—that was housed with 24 square feet of space and in conditions that allow the sow to turn around freely without touching her enclosure. Hardly any commercially-bred sows in the United States are housed with 24 square feet of space per sow, even those raised in group pens; and farmers almost universally keep sows in individual pens that do not comply with Proposition 12 during the period between weaning and confirmation of pregnancy, for animal health and business reasons.

Petitioners' complaint (App., *infra*, 147a-233a) alleges that Proposition 12 violates the dormant Commerce Clause in two ways.

First, it is impermissibly extraterritorial. California imports 99.87% of its pork. Because of the nature of the pork industry and its product—a pig progresses through multiple facilities outside California as it is raised, and is processed into many different cuts of meat that are sold across the country—Proposition 12 in practical effect regulates wholly out-of-state commerce. It requires massive and costly alteration to existing sow housing nationwide, necessitates either reduction of herd sizes or building of new facilities to meet its space mandates, raises

---

[1] CDFA, *Title 3. Food and Agriculture Proposed Regulations—Animal Confinement* (May 25, 2021); CDFA, *Animal Health and Food Safety Services Proposed Regulations—Animal Confinement* (May 25, 2021).

3

prices in transactions with no California connection, drives farms out of business and promotes industry consolidation, and will be policed by intrusive inspections of out-of-state farms conducted by California's agents. If any law violates the dormant Commerce Clause's extraterritoriality principle because of its practical effects on commerce in other states, it is Proposition 12—but the Ninth Circuit affirmed dismissal in large part because it deems that principle virtually a "dead letter." App., *infra*, 19a. Given this Court's "broad language" endorsing an extraterritoriality limit on state power, affected parties need a clear answer to the question whether that doctrine is indeed, as the Ninth Circuit seems to believe, "'overbroad * * * dicta' [that] can be ignored" (*id.* at 7a), or instead is an important component of our federalism.

Second, petitioners allege that Proposition 12 fails the balancing test of *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970). The law is based on a human health rationale so patently false that California has declined to defend it. Proposition 12 rests otherwise only on philosophical preferences about conduct occurring almost entirely outside California. Neither rationale out-weighs the wrenching effect of the law on interstate commerce.

The United States and its Department of Agriculture (USDA) share these views. They told the Ninth Circuit that the "'critical inquiry'" under *Healy* v. *Beer Institute*, 491 U.S. 324, 336 (1989), is "'whether the practical effect of the regulation is to control conduct beyond the boundaries of the State'" and that the "district court erred by dismissing the complaint" under that standard. U.S. Am. Br. at 1 (ECF 23). The United States provided four examples of how

4

Proposition 12 disrupts elements of the interstate pork market of special concern to the federal government: Agricultural Marketing Service reporting of hog prices, which is the basis of much market pricing nationwide; administration of the Emergency Food Assistance Program; the purchasing power of the Supplemental Nutrition Assistance Program; and compromising of farm biosecurity measures, which imposes burdens on USDA's Animal Plant and Health Inspection Service. U.S. Br. at 2-5.

In addition, the United States explained, Proposition 12 is based on "an improper purpose"—banning pork imports "based solely on a desire to prevent what California considers animal cruelty that is occurring entirely outside the State's borders." U.S. Br. at 2. Because California advances no "legitimate local interest" (*id.* at 18), petitioners' *Pike* challenge also should not have been dismissed.

In labelling the *Healy* line of cases dicta that can be ignored, the Ninth Circuit has undermined our federalist system, as 20 States explained below. Proposition 12's extraterritorial reach threatens other states' sovereignty, including their "decisions *not* to impose burdensome animal-confinement requirements on their farmers." States' Am. Br. at 16 (ECF 22). An Ohio law illustrates the point. Ohio expressly permits sow farmers to do what Proposition 12 forbids —to confine sows in breeding pens post-weaning until a new pregnancy is confirmed. Ohio Admin. Code 901:12-8-02(G)(4), (5). And Proposition 12, these States agree, has the impermissible effect of regulating "multiple transactions occurring wholly in other States—such as farm procurement and production, sale to distributors, and slaughter and

5

packing"—before any transaction occurs in California. States' Am. Br. at 14.

Five trade groups, representing a broad swath of American industry, likewise urged that our Nation's "foundational limits" on a state's power over out-of-state conduct require reversal, lest state overreach "fracture[s] national markets." Am. Br. of National Association of Manufacturers *et al.* at 4-5 (ECF 21).

The Ninth Circuit's dormant Commerce Clause jurisprudence has gone off track. In conflict with other circuits, most notably the Seventh Circuit, and with this Court's *Healy* line of cases, the Ninth Circuit has so narrowed the scope of the extraterritoriality doctrine that plausible allegations that a state law has "dramatic upstream effects," forces "pervasive changes to the pork production industry nationwide," and causes substantial "cost increases to market participants and customers" everywhere, fail to state a claim. App., *infra*, 18a, 20a. This Court should grant certiorari to clarify that basic principles of our federalism require a different result.

## A. Proposition 12

Proposition 12 forbids the sale of whole pork meat in California when the seller knows or should know that the meat came from the offspring of a sow that was confined "in a cruel manner." Cal. Health & Saf. Code § 25990(b)(2). "A cruel manner" is defined to mean confining a sow "six months or older or pregnant" in a manner that prevents the animal "from lying down, standing up, fully extending its limbs, or turning around freely," and, starting January 1, 2022, "confining a [sow] with less than 24 square feet of useable space" *Id.*, §§25991(a), (e). Among other narrow exclusions, these requirements do not apply

6

for five days before a sow gives birth or while it is nursing piglets. *Id.*, §25992(f). Every sale of covered pork in California that does not meet these standards is a crime punishable by a $1000 fine or a 180-day prison sentence, and also subjects the seller to a civil action for damages. *Id.*, §25993(b). The animal rights activists who created and promoted the ballot initiative tout it as "the strongest law of its kind in the world." Pallotta, *Wins for Animals in the 2018 Midterm Election*, Animal Legal Defense Fund (Jan. 5, 2019).

The stated justifications for Proposition 12's housing standards are (1) "to prevent animal cruelty by phasing out extreme methods of farm animal confinement" and (2) to protect California consumers from "the risk of foodborne illness and associated negative fiscal impacts on the State of California." App., *infra*, 37a §2.

Proposition 12 directs the CDFA and Department of Public Health (CDPH) to produce implementing regulations by September 1, 2019. Cal. Health & Saf. Code § 25993(a). The agencies missed that deadline, but proposed regulations in May 2021 that contemplate on-site inspection and certification of sow farms by agents of California. App., *infra*, 123a-124a. The proposed rules require that agents of the CDFA be given "access to the production and/or distribution operation," "offices," and any place "where covered animals and covered animal products may be kept, produced, processed, handled, stored or transported," and that they be allowed "to examine all covered products that are sold or intended, held, segregated, stored, packaged, labeled, or represented for sale or distribution" anywhere, and all "containers, labels, labeling, invoices, documents of title, and bills of

7

lading used in the handling, storage, packaging, sale, transportation or distribution of covered products." *Id.* at 123a. The proposed regulations require that all sale and shipping documents identify pork as either "California 24+ compliant" or "Not for California Consumption." *Id.* at 110a. And they mandate that any out-of-state government entity certifying facilities as Proposition 12-compliant must use a "process equivalent" to that required by CDFA rules. *Id.* at 128a.

Californians consume 13% of the pork eaten in the U.S. But California has only "about 0.133% of the national breeding herd," the CDFA admits. App., *infra*, 80a. Thus, 99.87% of the pork consumed there comes from hogs born on farms outside of the State, and it is to out-of-state sow farms that Proposition 12 almost exclusively applies. *Id.* at 150a-151a, ¶¶16-20.

## B.  The pork production industry

Across the country, 65,000 farmers raise 125 million hogs per year with gross sales of $26 billion. The pork production process is segmented. The production chain starts on a sow farm—most located in the Midwest or North Carolina—where sows give birth to piglets. Production then involves multiple steps, transactions, and actors before cuts of pork from a market hog reach consumers. This segmented model promotes herd health and produces economies of scale that enable American pork farmers to provide consumers with affordable and plentiful proteins. App., *infra*, 147a-148a, ¶¶1-7. It also makes it impossible to trace every cut of pork back to a particular sow housed in a particular way. *Id.* at 182a, ¶130.

8

### 1. *Sow housing*

Determining how to house sows is a critical farm management decision informed by animal-welfare and production considerations. App., *infra*, 184a, ¶¶147-149. Sow housing is either individual or group or some combination of the two. *Id.* at 185a-186a, ¶¶150-152, 161-162. Most sow farmers—some 72%— care for their sows in individual pens throughout gestation. *Id.* at 204a, ¶286. These pens provide around 14 square feet of space and—for hygiene, safety, and animal-welfare and husbandry reasons— do not allow the sow to turn around. *Id.* at 151a, ¶24; 185a, ¶155. Individual pens provide a sow with individual access to water and feed without competition or aggression from other sows. *Id.* at 185a, ¶¶156-57. This reduces sow stress, injury, and mortality; it also protects farm workers from injury. *Id.* at 172a-175a, ¶¶74-90; 186a, ¶159; 222a, ¶¶394-395.

The remaining 28% of farmers keep their sows most of the time in group pens, which generally provide 16 to 18 square feet of space per sow. App., *infra*, 186a, ¶162; 204a, ¶284.[2] Group housing poses complex management challenges to farmers in dealing with nutrition, medical care, sow safety and

---

[2] Farmers typically keep young, unbred female pigs (gilts) in group pens with less space per pig because gilts are smaller than mature sows. Gilts are kept separate from sows until they are ready to breed at seven or eight months. App., *infra*, 175a-176a, ¶¶91-92. Proposition 12 covers the housing of gilts, however, once they reach six months of age. Cal. Health & Saf. Code § 25991(a). It therefore requires substantial changes in the housing of gilts and supply of sows to sow farms. App., *infra*, 198a, ¶¶244-249.

9

productivity, and employee safety. *Id.* at 186a-188a, ¶¶163-177.

Almost universally, farmers who use group pens house their sows in individual breeding pens for the 30 to 40 days between the time a sow finishes weaning a litter through the time she is re-bred and pregnancy is confirmed. App., *infra*, 173a-174a, ¶¶77-82; 204a, ¶287. This practice allows farmers to provide individualized care and nutrition to sows that foster recovery from the stress of giving birth and weaning, and it protects sows from death, injury, pregnancy loss, or a drop in litter size due to aggression from other sows. *Id.* at 173a-175a, ¶¶79-90; 189a-191a, ¶¶181-206. Most farmers consider the use of individual breeding pens vital to keeping sows healthy and successfully breeding piglets. *Id.* at 159a-169a, ¶58(a)-(l); see also *id.* at 266a, ¶25; 281a, ¶23; 289a-290a, ¶¶16-17; 312a, ¶14; 317a-318a, ¶¶12-13; 323a-324a, ¶16; 332a, ¶11.

In short, almost no sow farmers in the country satisfy Proposition 12's sow housing requirements, and most believe that those requirements would harm their animals, employees, and operations. App., *infra*, 172a-174a, ¶¶73-84; 175a, ¶90; 204a, ¶¶283-289.

### 2.   *Vertical segmentation of pork production*

After weaning, piglets are moved to nursery farms in a separate facility. App., *infra*, 184a, ¶142. This rapid removal of piglets from sow farms, and separation of sow farms from other hog farms, is essential to protect herds from disease. *Ibid.*[3] At

---

[3] Biosecurity is a major concern for pig farmers, because whole herds can be wiped out by diseases like the African swine fever, which has killed hundreds of millions of pigs around the world.

10

nursery farms, piglets are raised for six to eight weeks, until they have grown into "feeder pigs" weighing 40 to 60 pounds. *Id.* at 149a, ¶11; 184a, ¶143.

Feeder pigs are then raised for 16 to 17 weeks at finishing farms. App., *infra*, 149a, ¶11; 181a, ¶121. Once they have reached 240 to 280 pounds, market hogs are sold to packer-slaughter facilities, often through years-long supply agreements that specify the number and timing of hogs to be delivered to the packer. *Id.* at 181a, ¶126; 184a, ¶144.

Packers slaughter market hogs—thousands or tens of thousands daily—to process and pack cuts of pork. App., *infra*, 150a, ¶13; 181a, ¶124. Some vertically integrated companies breed, raise, slaughter, and process hogs, but packers most commonly receive hogs from many different farms, including affiliated and independent farms, under multi-year contracts, and also acquire hogs on the spot-market. *Id.* at 149a, ¶¶11-12; 181a, ¶¶125-26.

Because pigs are serially transferred among multiple farming operations as they grow, it often is not clear upon their arrival at a packing facility which sow farm they originated from—let alone the housing conditions after the age of six months of the sow that gave birth to them. App., *infra*, 181a-182a, ¶¶125, 130-131; 198a, ¶¶244-249.

---

Diseases can be spread by both pigs and humans; they are addressed by strict separation and decontamination measures and by limiting access to farms. App., *infra*, 225a, ¶¶412-417.

11

### 3. *Processing of a market hog into different cuts of pork sold to different buyers and locations*

Packers process hogs received from different sources into different cuts of pork destined for different markets across the country and abroad. App., *infra*, 150a, ¶¶13, 19; 176a-177a, ¶96. Pork product packages may also combine meat from different pigs. *Id.* at 149a, ¶12; 158a-169a, ¶58; 176a-177a, ¶96; 182a-183a, ¶¶130-133. Rarely is the whole pig sold. As a result, it is not possible to trace every pork product that comes out of a packing facility back to a particular sow housed a particular way. *Id.* at 182a, ¶130.

Packers sell pork cuts to wholesale and large retail customers. App., *infra*, 150a, ¶13; 181a, ¶124. Retailers in turn distribute pork to consumers. *Id.* at 181a, ¶124. The number of actors among which a pork cut is transferred before reaching the end-consumer depends on the ultimate purchaser as well as the type of pork product. *Id.* at 181a, ¶127. Each pork cut bears production costs stemming back to the beginning of the supply chain—the sow that gave birth to the market hog—no matter where it is sold. *Id.* at 177a-178a, ¶96.

### C. **Proposition 12's nationwide impact on production and pricing**

Proposition 12 imposes steep compliance costs on almost entirely out-of-state sow farms. It requires a production method that increases sow mortality, reduces litter sizes, and reduces productivity (fewer sows can be housed in the same amount of space). As a result, petitioners alleged, Proposition 12-compliant producers will need to spend "an estimated

12

$293,894,455 to $347,733,205 of additional capital in order to reconstruct their sow housing and overcome the productivity loss that Proposition 12 imposes." App., *infra*, 214a, ¶342. The pre-ballot report that accompanied Proposition 12, prepared by the Legislative Analyst Office for California Attorney General (LAO Report), admitted that Proposition 12 will require producers to remodel existing sow housing or build new housing. *Id.* at 195a, ¶231. Smaller sow farms may not be able to bear these costs, which will lead to consolidation in the industry. *Id.* at 213a, ¶341.

Proposition 12 will cause significant market dislocation and price impacts that cannot be cabined to California sales. Petitioners allege that compliance will increase production costs by over $13 dollars per pig, a 9.2% cost increase at the farm level. App., *infra*, 214a, ¶343. Increased production costs will flow through to every market hog born to every sow raised in compliance with Proposition 12, and to every cut of meat from each of those market hogs—regardless of where that meat is sold. Variations in demand by location and season mean there is virtually no such thing as a processed hog whose cuts are all sold in California. Proposition 12's massive additional costs will necessarily spill over to sales of pork that have nothing to do with California. *Id.* at 214-215a, ¶¶344-350.

The CDFA acknowledged that, within California, Proposition 12 will make pork "more expensive to consumers," "disproportionately reduce food purchasing power of low-income consumers," substantially increase costs to public entities like schools, and impose substantial conversion, operating, and record-keeping costs on sow farmers,

13

including "lower piglet output per animal and increased breeding pig mortality." App., *infra*, 68a, 85a-86a. The LAO Report likewise predicted that consumer prices for pork would increase in California. *Id.* at 195a, ¶230. But Proposition 12 will necessarily have those same effects *outside* of California as well, because compliance costs apply not only to the cuts of pork sold in California, but also to all pork from any hog born to a Proposition-12 compliant sow, wherever that pork is sold. Farmers and consumers everywhere will pay for California's preferred animal-housing methods. *Id.* at 214a, ¶¶343-347.

The practical effects of Proposition 12 on nationwide commerce in pork will be even greater. It is infeasible to selectively house sows in compliance with Proposition 12 only when the pork from their offspring will be sold in California. Because it is impracticable, in the complex, multi-stage pork production process, to trace a single cut of pork back to a particular sow housed in a particular manner from six months of age on, buyers of market hogs everywhere will demand that farmers selling those hogs trace their origins to Proposition 12-compliant sow farms. App., *infra*, 206a, ¶¶298-301. As the complaint alleges, that is already happening. *Id.* at ¶300; see U.S. Br. at 21 (although "some of these burdens would result from the decisions of other market participants rather than the direct terms of Proposition 12, they are properly subject to consideration and proof as part of determining the overall 'practical effect' of the law").

### D. The rulings below

Petitioners NPPC and AFBF challenged Proposition 12 on behalf of their farmer members, alleging that it violates the extraterritoriality principle of the

14

dormant Commerce Clause because its practical effect is to control commerce outside of California's borders. Petitioners further alleged that Proposition 12 violates the dormant Commerce Clause by placing an excessive burden on interstate commerce while offering no cognizable local benefit. App., *infra*, 207a-215a. The district court dismissed these claims. *Id.* at 21a-35a.

On de novo review the Ninth Circuit affirmed. It accurately characterized petitioners' allegations:

> A single hog is butchered into many different cuts which would normally be sold throughout the country. In order to ensure that they are not barred from selling their pork products into California, all the producers and the end-of-chain supplier will require assurances that the cuts and pork products come from [sows] confined in a manner compliant with Proposition 12. * * * As a practical matter, given the interconnected nature of the nationwide pork industry, all or most [sow] farmers will be forced to comply with California requirements. The cost of compliance with Proposition 12's requirements is high, and would mostly fall on non-California transactions, because 87% of the pork produced in the country is consumed outside California.

App., *infra*, 9a. Petitioners thus "plausibly alleged that Proposition 12 will have dramatic upstream effects," "require pervasive changes to the pork production industry nationwide," and cause "cost increases to market participants and customers" everywhere. *Id.* at 18a, 20a. Nevertheless, the court of

15

appeals held that petitioners have failed to state a claim, for three principal reasons.

First, the "broad language" in this Court's *Healy* line of cases is "'overbroad extraterritoriality dicta'" that "'cannot mean what they appear to say.'" App., *infra*, 7a. *Healy*'s explanation that the extra-territoriality principle "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, *whether or not the commerce has effects within the [regulating] State*'" (491 U.S. at 336 (emphasis added)), is limited to "'price control or price affirmation statutes.'" App., *infra*, 8a (quoting *Pharm. Rsch. & Mfrs of Am.* v. *Walsh*, 538 U.S. 644, 669 (2003)). Proposition 12 does not satisfy that "narrow interpretation" because, although it causes "cost increases" to customers everywhere, it does not "dictat[e]" pork prices or tie "California to out-of-state prices." App., *infra*, 8a, 18a.

Second, Ninth Circuit precedent holds that "significant upstream effects outside of the state" do not violate the Commerce Clause, "even if the burden of the law falls primarily on citizens of other states," when the law directly "regulate[s] only conduct in the state," like in-state sales. App., *infra*, 10a. Petitioners' allegations that, "as a practical matter," "all or most [sow] farmers will be forced to comply with California requirements" because of the structure of the industry and nature of its product, and that the "high" "cost of compliance" will "mostly fall on non-California transactions," therefore fail to state a claim. *Id.* at 9a. And no matter how intrusive on businesses and property in other states, certification "for in-state health and safety purposes" is "not an impermissible extraterritorial effect." *Id.* at 12a-13a.

16

Third, turning to *Pike* balancing, the court of appeals attributed no "significant burden on interstate commerce" to the massive effects of Proposition 12 on out-of-state businesses and transactions, because it deemed those effects the result only of "increased costs," which "do not qualify" for dormant Commerce Clause purposes. App., *infra*, 17a-18a. Having found no qualifying burden, the court did not weigh the supposed benefits of the law, despite the fact that California refused to defend the asserted human health benefit and the United States pointed out that an animal protection ground directed to out-of-state pigs is illegitimate.

## REASONS FOR GRANTING THE PETITION

According to the Ninth Circuit, the dormant Commerce Clause prohibits state laws that "directly regulat[e] transactions that are conducted entirely out of state," but never laws that "directly regulat[e] only the in-state sales of 'products that are brought into'" the regulating state. App., *infra*, 14a, 19a. That formalistic distinction unduly circumscribes what this Court has described as "the critical consideration": "the overall effect of the statute on both local and interstate activity." *Brown-Forman Distillers Corp.* v. *N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). If "the *practical effect* of the regulation is to control conduct beyond the boundaries of the state" (*Healy* v. *Beer Institute*, 491 U.S. 324, 336 (1989) (emphasis added)), it "is invalid under the Commerce Clause" (*id.* at 332); it is of no moment that the law only *directly* regulates in-state sales. When "one state *regulates by indirection*" commercial transactions that occur elsewhere, interstate commerce may still be "burdened unduly." *Baldwin* v. *G.A.F. Seelig*, 294 U.S. 511, 524 (1935) (emphasis added).

17

That is so here. Proposition 12, in practical effect, substantially burdens interstate commerce. Thus:

- California residents consume 13% of the Nation's pork, and 99.9% of pork sold in the State derives from sows raised out-of-state.

- Hardly any sow anywhere is now housed as Proposition 12 requires.

- Pork is a $26-billion-a-year interstate business in the U.S., with significant international imports and exports.

- Tracing a particular cut of meat to a particular sow housed a particular way is an impossible task, given the highly segmented and distributed pork production process, which is designed to prevent disease and efficiently produce inexpensive protein, combined with packing plants that process tens of thousands of pigs a day, from innumerable farms, into varied cuts destined for far-flung customers.

- Packers, and customers faced with potential criminal and civil liability, have already begun to respond to Proposition 12 by demanding that all pork they buy comply with its requirements.

- Each cut of meat from a pig born to a sow housed in conformity with Proposition 12 bears the significant cost of compliance—about $13 per pig, petitioners allege—regardless of where it is sold; and 87% of that meat is sold outside of California. Consumers everywhere will pay for Proposition 12, disrupting supply and demand nationwide.

- California plans to send its agents out to inspect and certify every farm from which any

18

cut of meat may reach the State; and because hardly any sow farm can guarantee that none of its pork will be sold in California, this will create a nationwide on-the-ground certification regime run by California regulators.

- Other states expressly permit their farmers to use sow housing methods that California prohibits. Ohio, for example, allows its farmers to use individual pens post-weaning "to maximize embryonic welfare and allow for the confirmation of pregnancy" (Ohio. Admin. Code 901:12-8-02(G)(4), (5))—which Proposition 12 forbids.

Under our system of federalism, of which the dormant Commerce Clause is a critical component, "[o]ne state may not put pressure of that sort upon others to reform their economic standards." *Baldwin*, 294 U.S. at 524.

Writing for the Court in *Baldwin*, Justice Cardozo gave an example of direct regulation of in-state sales that nevertheless violates the Commerce Clause because of its indirect out-of-state effects: a state "condition[ing] importation [of goods] upon proof of a satisfactory wage scale" paid to out-of-state producers. 294 U.S. at 524. If California cannot constitutionally condition the sale of pork in the State on out-of-state slaughterhouse workers being paid a certain minimum wage, it also cannot condition the sale of pork on sows in other states being housed in a certain way.[4] In both cases the practical effect is to specify the

---

[4] California admitted at oral argument in another challenge to Proposition 12 that Proposition 12 is legally indistinguishable from a law that prohibits the sale of a product in the State unless those involved in manufacturing the product were paid at least

19

means of production of goods to be used in other states, and to alter commercial transactions among out-of-state parties that are unrelated to California. Indeed, Proposition 12's stated goal is to change the national pork industry: "to prevent" California's conception of "animal cruelty by phasing out extreme methods of farm animal confinement." App., *infra*, 37a.

The Ninth Circuit described the dormant Commerce Clause as headed "in th[e] direction" of being a "dead letter"—and its ruling surely completes that journey. App., *infra*, 19a. But as the United States and 20 States explained below, the "practical effects" limit on state power serves important purposes in our federalist system of government. "[T]o the extent that the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected." *S. Pac. Co.* v. *Arizona*, 325 U.S. 761, 767 n.2 (1945). Courts, therefore, must supply that restraint. See *Bristol-Myers Squibb Co.* v. *Super. Ct. of Cal.*, 137 S. Ct. 1773, 1780-81 (2017) ("territorial limitations on the power of the respective States" mean that, even when a state "has a strong interest in applying its law," the Constitution, "acting as an instrument of interstate federalism, may sometimes act to divest the State of its power").

The Ninth Circuit held—in another example of formalism overriding practical inquiry—that other

---

California's minimum wage. California argued that neither law violates the Commerce Clause, because their direct focus is on in-state sales. See Oral Argument at 16:09-18:30, *N. Am. Meat Inst.* v. *Becerra*, https://www.ca9.uscourts.gov/media/video/?20200605/19-56408.

20

states' sovereignty is infringed only by actually "conflicting regulations" affecting businesses with "a need for uniform national regulation." App., *infra*, 15a. But other states' ability to regulate their own farmers' conduct and decide what is acceptable animal housing in their states—and similarly to determine an appropriate minimum wage—are basic elements of states' territorial authority. Proposition 12 in practice undermines "the legitimate regulatory regimes of other states," which is enough to trigger the dormant Commerce Clause. *Healy*, 491 U.S. at 336. And it interferes with the free interstate trade on which our states' and national economies depend. See *H.P. Hood & Sons* v. *Du Mond*, 336 U.S. 525, 539 (1949) ("Our system, fostered by the Commerce clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation"). Absent this Court's intervention now, extraterritorial laws like Proposition 12 will proliferate, dividing our polity and disrupting our Nation's economy.

## I. THE NINTH CIRCUIT'S DECISION EVISCERATES THE ESSENTIAL PROT-ECTIONS PROVIDED BY THE EXTRA-TERRITORIALITY DOCTRINE

The Ninth Circuit held that petitioners have plausibly alleged that Proposition 12's "dramatic upstream effects" include "pervasive changes to the pork production industry nationwide" and "cost increases to market participants and customers" all over the country. App., *infra*, 18a, 20a. Its ruling that the complaint nevertheless was properly dismissed cannot be reconciled with this Court's descriptions of the extraterritoriality doctrine, or with decisions of other circuits recognizing that a state may not

21

regulate by indirection transactions that occur wholly outside of that state.

### A. The Ninth Circuit's Decision Conflicts With This Court's Precedents Holding That The Extraterritoriality Doctrine Applies When A State Indirectly Regulates Transactions Occurring Wholly In Other States

1. This Court's concern with the extraterritorial effect of a state's regulations is deeply engrained in its dormant Commerce Clause jurisprudence and in the federalism principles that animate the Court's oversight of state economic regulation under the Commerce Clause in the absence of Congressional action. In *Healy*, this Court explained that focus on the "extraterritorial effects of state economic regulation" "reflect[s] the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." 491 U.S. at 335-336. Those "special concerns" are equally implicated whether a state's regulation directly or indirectly affects transactions or conduct wholly outside of the regulating state because the "practical effect" can be the same in either instance. See *Baldwin*, 294 U.S. at 524.

The Court in *Healy* construed its dormant Commerce Clause precedent to stand for three propositions: (1) the Commerce Clause "'precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State'"; (2) "a statute that directly controls commerce occurring

22

wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature"; and (3) "the practical effect of a statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." 491 U.S. at 336-337. The Court confirmed that "[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.* at 336; see also *Brown-Forman*, 476 U.S. at 579 ("the critical consideration is the overall effect of the statute on both local and interstate activity").

The Ninth Circuit's description of this extra-territoriality doctrine as nearly a "dead letter" notwithstanding, this Court recently recognized that the doctrine remains relevant, citing it as a distinct "exception[] [or] variation[]" to the dormant Commerce Clause's prohibitions against discrimination in interstate commerce or the imposition of undue burdens on that commerce. *S. Dakota* v. *Wayfair, Inc.*, 138 S. Ct. 2080, 2090 (2018).

2. The Ninth Circuit refused to give these plain rules their full effect, instead suggesting that the *Healy* line of cases, with their focus on a law's practical effects on interstate commerce, "'cannot mean what they appear to say.'" App., *infra*, 7a. In support of that view, it cited *Pharmaceutical Research & Manufacturers of America* v. *Walsh*, 538 U.S. 644, 669 (2003), opining that the Court there "indicated

23

that the extra-territoriality principle * * * should be interpreted narrowly as applying only to state laws that are 'price control or price affirmation statues.'" App., *infra*, 8a. But that is not a correct reading of *Walsh*.

In *Walsh*, this Court considered the application of *Healy* and *Baldwin* to a Maine law that required the state to attempt to negotiate rebates with prescription drug manufacturers and, if the negotiations were unsuccessful, would require prior authorization before prescriptions for the manufacturer's drugs could be reimbursed under the Medicaid program. The Court determined that *Healy* and *Baldwin* were inapplicable to a claim that Maine's law controlled out-of-state prices because the law "does not regulate the price of any out-of-state transaction, either by its express terms or by its inevitable effect" and Maine "is not tying the price of its in-state products to out-of-state prices." *Walsh*, 538 U.S. at 669.

The court of appeals cited prior Ninth Circuit case law (*Ass'n des Eleveurs de Canards et d'Oies du Quebec* v. *Harris*, 729 F.3d 937 (9th Cir. 2013)), and a Tenth Circuit decision (*Energy & Env't Legal Inst.* v. *Epel*, 793 F.3d 1169 (10th Cir. 2015)), that adopted the view that *Walsh* limited *Healy*'s extraterritoriality doctrine to cases involving price-control or price-affirmation statutes. App., *infra*, 8a. But that interpretation of *Walsh* cannot be squared with this Court's decisions examining the extraterritorial effect of state laws in non-price cases involving environmental standards (*C&A Carbone, Inc.* v. *Town of Clarkston*, 511 U.S. 383 (1994)), or laws that impose notification and registration requirements on corporations (see *Edgar* v. *MITE Corp.*, 457 U.S. 624, 642-643 (1982) (discussing the law's "sweeping extra-

24

territorial effect" and applying the practical effects test)). And in holding that the dormant Commerce Clause requires a court to consider the "practical effect" of the challenged law, this Court in *Brown-Forman* cited *Southern Pacific*, 325 U.S. at 775, which was not a price-control or price-affirmation case, but rather involved regulation of the length of trains. *Brown-Forman*, 476 U.S. at 583. This underscores that there is no principled reason to limit the extraterritoriality doctrine to price-control cases.

3. The Ninth Circuit ultimately concluded that *Walsh* did *not* "expressly narrow[] the extra-territoriality principle to only price-control and price-affirmation cases" and that "we have recognized a 'broader understanding of the extraterritoriality principle' may apply outside this context." App., *infra*, 10a (quoting *Ward* v. *United Airlines, Inc.*, 986 F.3d 1234, 1240-1241 (9th Cir. 2021)). Instead, the court applied its line of cases holding that "state laws that regulate only conduct in the state, including the sale of product in the state, do not have impermissible extraterritorial effects" regardless of effects on the nationwide market. *Ibid*.

That is wrong too. The Ninth Circuit's ruling that "[a] state law is not impermissibly extraterritorial unless it *directly* regulates conduct that is wholly out of state" (App., *infra*, 10a (emphasis added)) is inconsistent with the rule that the court must consider the "practical effect" of a regulation to determine whether it has an impermissible extra-territorial effect, even if that effect is the result of "regulat[ion] by indirection." *Baldwin*, 294 U.S. at 524. In *Brown-Forman*, this Court explained that the fact that the New York liquor control law was "addressed only to sales of liquor in New York is

25

irrelevant if the 'practical effect' of the law is to control prices in other States." 476 U.S. at 583. Similarly, here, the fact that Proposition 12 is addressed only to sales of pork in California is irrelevant because the practical effect of the law is to affect transactions and activities occurring wholly outside of California.

In its *amicus* brief in support of petitioners below, the United States agreed that a narrow interpretation of the extraterritoriality doctrine and the *Healy* practical-effects test is improper. The United States argued that *Walsh* did not limit the doctrine to price-control statutes, but rather simply found *Baldwin* and *Healy* inapplicable because plaintiffs' argument—that the Maine law would affect prices in other states— was incorrect. U.S. Br. at 25-26. "The Court did not address the viability of the rule in other contexts." *Id.* at 26. Further, the United States agreed that the practical-effects test applies to laws that regulate only in-state sales. *Id.* at 26-28.

The Ninth Circuit effectively admitted that its decision is irreconcilable with the plain language of the *Healy* practical-effects test when it surmised that *Healy* does not mean what it unambiguously says. App., *infra*, 7a. The court of appeals then applied a crabbed interpretation of the test, in clear violation of the maxim from *Baldwin* that the Commerce Clause is invoked when "one state regulates by indirection" activities wholly occurring in other states. 294 U.S. at 524.

This error is important because the Ninth Circuit agreed that petitioners have plausibly alleged severe indirect effects upon the massive and critical nationwide pork market as a result of Proposition 12, which will land almost entirely on residents outside of California. App., *infra*, 9a. This Court's review is

26

required to clarify that *Healy* means what it says and that the extraterritoriality doctrine is not a dead letter.

### B. The Circuits Are Split On The Meaning Of *Walsh* And The Applicability Of The Practical-Effects Test

The court of appeals' decision illustrates a split among the circuits that requires this Court's intervention.

1. As the Ninth Circuit acknowledged, there is intra-circuit confusion about whether *Walsh* limits application of the extraterritoriality doctrine to price-control statutes. *Compare* App., *infra*, 9a ("We have recognized that the Supreme Court has not expressly narrowed the extraterritoriality principle to only price-control and price-affirmation cases, and we have recognized a broader understanding of the extra-territoriality principle may apply outside this context" (cleaned up)), *with Eleveurs*, 729 F.3d at 951 (holding that the extraterritoriality doctrine is "not applicable to a statute that does not dictate the price of a product and does not tie the price of its in-state products to out-of-state prices" (cleaned up)). The same split exists *among* the circuits.

The Tenth Circuit has held that *Walsh* "emphasized as we do that the *Baldwin* line of cases concerns only 'price control or price affirmation statutes' that involve 'tying the price of … in-state products to out-of-state prices.'" *Energy & Envt'l Legal Inst.*, 793 F.3d at 1174-1175 (quoting *Pharm. Research*, 538 U.S. at 669 and citing *Eleveurs*, 729 F.3d at 951). The Fourth Circuit has disagreed, concluding that *Walsh* "does not suggest that 'the rule that was applied in *Baldwin* and *Healy*' applies

27

*exclusively* to 'price control or price affirmation statutes.'" *Ass'n for Accessible Medicines* v. *Frosh*, 887 F.3d 664, 671 (4th Cir. 2018). The Sixth Circuit has also declined to read *Walsh* as limiting the extraterritoriality doctrine to price-control statutes, explaining that it is a "powerful but precise instrument—invalidating state laws" when, among other circumstances, a state "inevitably exceeds its authority and seeks to control wholly out-of-state commerce." *Online Merchants Guild* v. *Cameron*, 995 F.3d 540, 559 (6th Cir. 2021).

2. Even among the circuits that do not interpret *Walsh* to limit the extraterritoriality doctrine to price-control statutes, there is disagreement about the scope of the test. The court below considered the doctrine to be inapplicable when a state law indirectly regulates wholly out-of-state conduct, regardless of the law's practical effect. App., *infra*, 10a-11a. By contrast, the Seventh Circuit—which covers two of the largest pork producing States, Illinois and Indiana—has held that a law "directly" and impermissibly regulated extraterritorially when the practical effect of the law was to dictate to out-of-state manufacturers how they must build their facilities.

In *Legato Vapors, LLC* v. *Cook*, 847 F.3d 825, 837 (7th Cir. 2017), the Indiana law imposed substantive requirements on the manufacture and distribution of vapor pens and the liquids used in e-cigarettes. Among other things, the law required manufacturers who wished to sell their products in Indiana to comply with rules governing the design and operation of their facilities as a condition of obtaining a certificate to sell their products in Indiana. *Id.* at 828. The manufacturers were also required to submit to audits and inspections by Indiana agents. *Id.* The Seventh

28

Circuit concluded that the law "directly regulate[s] the physical plants of out-of-state manufacturers" and, therefore, was "invalid as [an] extraterritorial law[]." *Id.* at 835.

Although the Indiana law bore the same relevant hallmarks as Proposition 12—which likewise regulates the physical plants of out-of-state manufacturers who wish to sell their products in California and requires them to submit to inspection by California's agents—the Ninth Circuit made no more than passing reference to *Legato Vapors* in its decision. App., *infra*, 13a. The failure to engage with the Seventh Circuit may be attributable to the Ninth Circuit's belief that it was bound by its own precedent. Whatever the case, it is impossible to reconcile the decisions, one of which holds that it is constitutional for a state to, in practical effect, control the means of production used in other states, and the other which holds that doing so is unconstitutional. This Court's intervention is needed to resolve the circuit conflict over the continued vitality and scope of the extraterritoriality doctrine.

## II. THE NINTH CIRCUIT IMPROPERLY NARROWED THE SCOPE OF *PIKE*

As the court of appeals acknowledged, petitioners have plausibly alleged that Proposition 12 has "dramatic" and "pervasive" effects on methods of pork production nationwide; that it "forc[es]" "all or most hog farmers" to "comply with California require-ments"; and that it imposes costs that "mostly fall on non-California transactions." App., *infra*, 9a, 20a. The Ninth Circuit nevertheless held that these effects do not trigger a *Pike* inquiry into whether Proposition 12's burden on interstate commerce is "clearly excessive in relation to the putative local benefits"

29

(397 U.S. at 142) because, as a matter of law, "increase[d] compliance costs, without more, do not constitute a significant burden on interstate commerce." App., *infra*, at 17a.

That was error and—because most effects of laws can ultimately be reduced to cost effects— fundamentally undermines *Pike*. It was certainly unjustified here, where petitioners allege, among other harms to commerce, that Proposition 12 in practice (1) requires a significant restructuring of an entire national, $26-billion industry; (2) requires out-of-state farmers to adopt housing that they believe endangers their herds, employees, and livelihoods; (3) requires California-compliant housing for sows regardless of whether their offspring are sold in California or elsewhere; and (4) will result in consolidation of the industry and put sow farmers out of business. Saying that these and other effects of Proposition 12 are just "increased costs" that don't count for dormant Commerce Clause purposes turns the *Pike* inquiry into a largely meaningless exercise. As we allege and explain above, these effects flow directly from Proposition 12 given the nature of the industry and its product and are substantial burdens on interstate commerce.

The only decision of this Court the Ninth Circuit cited is irrelevant. In *Exxon Corp.* v. *Governor of Maryland*, 437 U.S. 117, 127 (1978), the Court held that the likelihood that some out-of-state refiners would stop selling gas in Maryland in response to a Maryland law, perhaps hurting Maryland consumers, was not a cognizable burden for dormant Commerce Clause purposes, because shifting business "from one interstate supplier to another" does not count. Petitioners make no such allegation here—they allege

30

that Proposition 12 will in practice require every sow farm to adopt its standards, completely reworking the industry and resulting in every U.S. pork consumer paying for California's preferred sow housing. That is a cognizable burden on interstate commerce, and it is "clearly excessive in relation to the putative local benefits" of the law. *Pike*, 397 U.S. at 142. Indeed, Proposition 12 does not offer *any* legitimate justification to counterbalance those burdens.

One purported justification for Proposition 12's sow-housing standards is to protect California consumers from "the risk of foodborne illness and associated negative fiscal impacts on the State of California." App., *infra*, 37a. States may indeed protect their citizens from noxious or otherwise harmful products, but that justification for Proposition 12 is so baseless that California declined to defend it in either court below. There is *no* evidence that the square footage provided to *a sow* has *any* bearing on the safety of pork derived from her *offspring*, which are separated from her immediately after weaning, raised in different facilities, and not processed into pork until at least six months later, in a facility where federal inspectors ensure the wholesomeness of the pork. App., *infra*, 226a-228a, ¶¶423-435. The CDFA itself admits that Proposition 12's space allowances "are not * * * accepted as standards within the scientific community to reduce food-borne illness" or "other human or safety concerns," or "drawn from specific industry standards." *Id.* at 75a-76a.

The second justification for Proposition 12 is "to prevent animal cruelty by phasing out extreme methods of farm animal confinement." App., *infra*, 37a. But nearly all the animals Proposition 12 affects

31

are housed outside of California. Thus, Proposition 12 rests on concerns about out-of-state animal husbandry, whereas the focus of the *Pike* test is on the "putative *local* benefits." 397 U.S. at 142 (emphasis added). Preventing allegedly cruel treatment of sows in other states—where the pigs are raised in compliance with *those* states' laws—is not a legitimate "local benefit." See *C&A Carbone*, 511 U.S. at 393 (invalidating local ordinance that sought to address local environmental issues by regulating out-of-state conduct).

The United States explained below that, "[t]o the extent out-of-state farming practices cause cruelty to animals, that harm is inflicted outside California and suffered by animals outside the State." U.S. Br. at 18. As a result, the State has no "plausible argument" that Proposition 12 "is intended to promote the welfare of animals within California." *Ibid.* And "California does not invoke any legitimate interest in avoiding in-state harm." *Id.* at 19 n.3.

The idea that Proposition 12 provides a local benefit is erroneous for another reason: requiring 24 square feet of space per sow is an arbitrary standard that has not been shown to improve sow welfare. App., *infra*, 219a, ¶¶376-377. In fact, providing that much space *decreases* sow welfare. *Id.* at 333a, ¶13. Dictating one prescriptive number limits the ability of farmers to make housing adaptations to best address the welfare of their sows. *Id.* at 220a, ¶386. And preventing the use of individual stalls during the vulnerable period between weaning and confirmation of pregnancy exposes sows to stress, injuries, or death. *Id.* at 221a, ¶390; 279a, ¶12; 310a-311a, ¶9; 340a, ¶33; 290a, ¶18.

32

With its substantial burdens on commerce and lack of any legitimate local benefit, Proposition 12 fails the *Pike* test and violates the dormant Commerce Clause.

\* \* \*

Until this Court addresses the vitality and meaning of *Healy*'s "practical effects" extraterritoriality doctrine, the bench, bar, and regulated parties will continue to expend resources on challenges to state laws that, while triggered by in-state activities, have their most substantial effect on out-of-state operations and transactions. This case rests on an unusually comprehensive set of allegations deemed plausible by the courts below. And those allegations detail how Proposition 12 causes extreme disruptions to an economically and nutritionally important national industry. This petition provides an ideal vehicle to resolve both the scope of the extraterritoriality doctrine and the operation of the *Pike* balancing test.[5]

---

[5] This Court's denial of certiorari to review an interlocutory order denying different plaintiffs' motion to preliminarily enjoin Proposition 12 (see *supra*, p. iv) carries no weight here, where we seek review of a final order dismissing a different complaint for failure to state a claim, which is subject to a different standard of review. See Stephen Shapiro, *et al.*, SUPREME COURT PRACTICE §4-18 (11th ed. 2019).

33

## CONCLUSION

The petition for a writ of certiorari should be granted.

Respectfully submitted.

DAN HIMMELFARB
COLLEEN CAMPBELL
  *Mayer Brown LLP*
  *1999 K Street, NW*
  *Washington, DC 20006*

TIMOTHY S. BISHOP
  *Counsel of Record*
BRETT E. LEGNER
  *Mayer Brown LLP*
  *71 South Wacker Drive*
  *Chicago, Illinois 60606*

ELLEN STEEN
TRAVIS CUSHMAN
  *American Farm Bureau*
  *Federation*
  *Suite 1000W*
  *600 Maryland Avenue SW*
  *Washington, DC 20024*

MICHAEL C. FORMICA
  *National Pork*
  *Producers Council*
  *122 C Street NW*
  *Suite 875*
  *Washington, DC 20001*

*Counsel for Petitioners*

SEPTEMBER 2021