Exhibit 8

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SACRAMENTO**

| HRG DATE / TIME | January 21, 2022 / 9:00 A.M. | DEPT. NO. | 17 |
|---|---|---|---|
| JUDGE | James P. Arguelles | CLERK | Ward |

| | |
|---|---|
| **CALIFORNIA HISPANIC CHAMBERS OF COMMERCE; KRUSE & SON, INC; CALIFORNIA GROCERS ASSOCIATION; CALIFORNIA RESTAURANT ASSOCIATION; and CALIFORNIA RETAILERS ASSOCIATION,**<br><br>     **Petitioners and Plaintiffs,**<br>**v.**<br><br>**KAREN ROSS, in her official capacity as the Secretary of the California Department of Food and Agriculture; TOMAS J. ARAGÓN, in his official capacity as the Director of the California Department of Public Health; ROB BONTA, in his official capacity as the Attorney General of the State of California; and ANNE MARIE SHUBERT, in her official capacity as the District Attorney of the County of Sacramento,**<br><br>     **Respondents and Defendants.** | **Case No.: 34-2021-80003765** |

| **Nature of Proceedings:** | **Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief – Final Ruling** |
|---|---|

The petition of Petitioners and Plaintiffs California Hispanic Chambers of Commerce; Kruse and Son, Inc.; California Grocers Association; and California Retailers Association (collectively "Petitioners") for a prohibitory writ of mandate is GRANTED in part and DENIED in part.

The court will issue a declaration that Petitioner and Plaintiff California Hispanic Chambers of Commerce, its members and its members' owners and operators; Petitioner and Plaintiff Kruse and Son, Inc. and its owners and operators; Petitioner and Plaintiff California Grocers Association, its members and its members' owners and operators; and Petitioner and Plaintiff California Retailers Association, its members and its members' owners and operators are not subject to enforcement of the prohibition on sales of whole pork meat pursuant to Health and Safety Code Section 25990(b)(2), as defined in Health and Safety Code Section 25991(e)(3), until

180 days after final regulations are enacted pursuant to Health and Safety Code Section 25993, subd. (a).[1]

The court will retain jurisdiction to modify the relief granted in light of changing circumstances.

Petitioners' third cause of action for an injunction shall be DISMISSED as duplicative.

Petitioners' request for judicial notice is unopposed and GRANTED.

The request for judicial notice filed by Respondents and Defendants Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture (CDFA); Tomas J. Aragón, in his official capacity as Director of the California Department of Public Health (CDPH); and Rob Bonta, in his official capacity as Attorney General of the State of California (Bonta) (collectively the "State Respondents") is unopposed and GRANTED.[2]

## Legal Background

In 2008, the voters approved Proposition 2, the Prevention of Farm Animal Cruelty Act, which took effect January 1, 2015. With exceptions, Prop. 2 banned three forms of animal confinement: "gestation crates for pregnant pigs, veal crates for calves, and battery cages for egg-laying hens." (*Animal Legal Defense Fund v. California Exposition & State Fairs* (2015) 239 Cal.App.4th 1286, 1290.) Prop. 2 did not prohibit sales of food derived from animals wrongly confined.

In November 2018, the voters built upon Prop. 2 by approving Proposition 12, the Prevention of Cruelty to Farm Animals Act (Act). The Act's stated purpose is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of California consumers, and increase the risk of foodborne illness and associated negative fiscal impacts on the State of California." (See § 25990 (West 2021), Historical and Statutory Notes.) The Act amends some provisions in Prop. 2 and adds additional provisions, including additional liability and enforcement provisions.

The Act prohibits California farmers from knowingly causing "covered animals" to be "confined in a cruel manner." (§ 25990(a).) "Covered animals" include calves raised for veal, breeding pigs and egg-laying hens. (§ 25991(f).) A "breeding pig" is "any female pig of the porcine species kept for the purpose of commercial breeding who is six months older or pregnant." (§ 25991(a); see also § 25991(d), (g) [defining "calf raised for veal" and "egg-laying hen"].) The prohibition against confinement in a cruel manner does not apply during transportation, during

---

[1] Undesignated statutory references shall be to the Health and Safety Code.

[2] Because Respondents/Defendants Ross and Taragón are sued in their official capacities only, the true Respondents/Defendants are the agencies they head, i.e., CDFA and CDPH.

humane slaughter pursuant to the Food and Agricultural Code and, for breeding pigs, "the five-day period prior to the breeding pig's expected date of giving birth, and any day that the breeding pig is nursing piglets." (§ 25992(c)-(f).)

The Act also prohibits persons in the supply chain from knowingly engaging in intrastate sales of food where such persons know or should know that the food is derived from a covered animal – whether originating within or outside California -- that was confined in a cruel manner. (§ 25990(b).) This prohibition on sales applies to any "business owner or operator," a term that the Act defines as "any person who owns or controls the operations of a business." The impacted foods are whole veal meat, whole pork meat, shell eggs and liquid eggs. (§ 25990(b)(1)-(b)(4).) The Act defines each of these foods. (See § 25991(l), (n), (p), (t), (u) and (v).)

Through a multi-part definition of the phrase "confined in a cruel manner," the Act was designed to take effect in phases:

"Confined in a cruel manner" means any one of the following acts:

(1) Confining a covered animal in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely.

(2) After December 31, 2019, confining a calf raised for veal with less than 43 square feet of usable floorspace per calf.

(3) After December 31, 2021, confining a breeding pig with less than 24 square feet of usable floorspace per pig.

(4) After December 31, 2019, confining an egg-laying hen with less than 144 square inches of usable floorspace per hen.

(5) After December 31, 2021, confining an egg-laying hen with less than the amount of usable floorspace per hen required by the 2017 edition of the United Egg Producers' Animal Husbandry Guidelines for U.S. Egg-Laying Flocks: Guidelines for Cage-Free Housing or in an enclosure other than a cage-free housing system.[3]

The Act's enforcement provisions appear in Section 25593. Subdivision (a) of this section provides that CDFA and CDPH "shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019," which was three months before the Act's first square-footage requirements took effect. Section 25993(b) further provides:

---

[3] "Usable floorspace" means "the total square footage of floorspace provided to each covered animal, as calculated by dividing the total square footage of floorspace provided to the animal in an enclosure by the number of animals in that enclosure." (§ 25991(s).)

Any person who violates any of the provisions of this chapter is guilty of a
misdemeanor, and upon conviction thereof shall be punished by a fine not to exceed
one thousand dollars ($1,000) or by imprisonment in the county jail for a period not to
exceed 180 days or by both such fine and imprisonment. In addition, a violation of
subdivision (b) of Section 25990 constitutes unfair competition, as defined in Section
17200 of the Business and Professions Code... . (Underlining omitted.)

By incorporating the Unfair Competition Law (UCL) in Section 17200 *et sequitur* of the Business
and Professions Code, the Act authorizes private parties claiming to have lost money or
property due to a prohibited sale of whole pork meat to sue for equitable relief. (See Bus. &
Prof. Code §§ 17202-17204.) The UCL also empowers Bonta, district attorneys and other public
prosecutors to sue and seek civil penalties. (See *id.*, §§ 17204, 17206.)

The Act provides business owners and operators with a good faith defense:

It shall be a defense to any action to enforce subdivision (b) of Section 25990 that a
business owner or operator relied in good faith upon a written certification by the
supplier that the ... whole pork meat ... was not derived from a covered animal who
was confined in a cruel manner, or from the immediate offspring of a breeding pig who
was confined in a cruel manner. (Underlining omitted.)

(§ 25993.1.) The Act does not define the terms "supplier" or "written certification." Nor does
the Act otherwise identify steps that a person might take to avoid being accused of selling foods
that (s)he should have known derived from a wrongly confined covered animal.

### Regulatory Efforts to Date

In February 2019, CDFA hosted a public workshop on the Act. The following April, CDFA
solicited written input from stakeholders. In the solicitation for input, CDFA wrote:

**To meet mandated enforcement responsibilities under Proposition 12,** CDFA is in the
process of developing a regulatory framework that includes production facility
registration, certification, verification audits or inspections, border station inspection
and a penalty matrix for violations including an appeal process. [...] **A registration
process for identifying and tracking the location of animal production facilities doing
business or potentially doing business in California is viewed as foundational to
effective certification and audit components of the overall regulatory framework for
verifying and documenting compliance with requirements.** [...]

HSC section 25993.1, added by Proposition 12, specifies that it shall be a defense to
any action to enforce this provision that the business operator relied in good faith
upon a written certification by the supplier that such products were not derived from
covered animals confined in a cruel manner. Thus, **CDFA views the validity of a
supplier's written certification to be critical to the integrity of the animal**

**confinement provisions that California businesses must comply with under Proposition 12, as well as to the overall effectiveness of ensuring that only products from animals raised and housed in conformance with the confinement provisions of the ballot measure reach markets within the state. To ensure this integrity, a certification program by CDFA would provide credible regulatory documentation of a production facility's good-standing with registration requirements and to conformance with the specific minimum enclosure and confinement standards of the law.**

CDFA's current thinking is that certification of a facility would be based on verification of compliance through direct field verification audits. [...]

(See Petitioners' RJN, Exh. C, p. 2, emphasis added.)

In 2020 and 2021, CDFA distributed or posted to its website information about the Act's mandates.

In May 2021, CDFA and CDPH released a Notice of Proposed Action pursuant to the Administrative Procedures Act, published proposed regulations, and triggered a 45-day public comment period. On December 3, 2021, CDFA published revised proposed regulations and triggered a 15-day further comment period.

The revised proposed regulations would add Chapter 10 to Title 3, Division 2 of the Code of Regulations. The new chapter, entitled "Animal Confinement," would require pork distributors to register with CDFA in order to engage in commercial sales in California. In addition, the regulations would enable CDFA to accredit third parties, who would then certify pork production and distribution operations' compliance with the Act's confinement requirements.

The proposed regulations' registration, certification and accreditation provisions would encompass on-site inspections as well as record-keeping obligations, which in turn would generate an "audit trail" sufficiently detailed to "document the identification, source, supplier, transfer of ownership, transportation, storage, segregation, handling, packaging, distribution, and sale of whole pork that was derived from a breeding pig, or immediate offspring of a breeding pig, confined in compliance with" the Act. (See Petitioners' RJN, Exh. E, p. 28.) Noncompliance would trigger administrative proceedings possibly resulting in the suspension or revocation of certification. In addition, any "written certification" providing an affirmative defense pursuant to Section 25993.1 would have to be based on the audit trail. Registrations by pork distributors would not be required until January 1, 2023, however, and pork producer certifications would not be required until January 1, 2024.

Final regulations are not in effect. Some grocery chains and pork suppliers have issued statements informally committing to comply with the Act. (But see Jones Decl., Exh. 9 ["Hormel Foods has assessed Proposition 12 and, *while it is still awaiting final clarity on specific details*

*and rules*, the company is preparing to comply when the law goes into effect on January 1, 2022"], emphasis added.)

## The Instant Proceeding

Petitioners are a meat processing operation and business associations whose members sell whole pork meat in California. Petitioners contend that they and/or their members should not be exposed to the Act's criminal and civil sanctions until CDFA and CDPH enact final regulations. Among other things, Petitioners allege that, without regulations fleshing out a written certification system supporting a good faith defense pursuant to Section 25993.1, they should not be subject to penalties associated with sales of nonconforming whole pork meat.

In their Verified Petition for Writ of Mandate and Complaint for Declaratory and Injunctive Relief (Petition), Petitioners advance causes of action against the State Respondents. Petitioners are also proceeding against Sacramento County District Attorney Anne Marie Shubert (Shubert) and her prosecutorial counterparts statewide, including county attorneys and city attorneys. The naming of a local prosecutorial official in a lawsuit is an accepted means of proceeding against all other local prosecutors within the state. (See *Planned Parenthood v. Van De Kamp* (1986) 181 Cal.App.3d 245, 257.)

With the first cause of action, Petitioners seek a judicial declaration pursuant to Code of Civil Procedure Section 1060. They ask the court to declare the square-footage requirement affecting pork sales effective January 1, 2022 unenforceable absent final implementing regulations from CDFA and CDPH. Petitioners' third cause of action for injunctive relief is aimed at an order barring Respondents from enforcing the same square-footage requirement until 28 months after CDFA and CDPH promulgate regulations. Petitioners allege that a 28-month post-promulgation delay corresponds with the time period between the Act's September 1, 2019 deadline to regulate and the January 1, 2022 date on which the square-footage requirement took effect.

With the second cause of action, Petitioners seek an ordinary writ of mandate pursuant to Code of Civil Procedure Section 1085. Again, Petitioners ask the court to delay enforcement of the square-footage requirement affecting sales of whole pork meat until 28 months after CDFA and CDPH issue final regulations. Petitioners' allegations include a discussion of cases in which the California Supreme Court reformed statutes in response to a petition for writ of mandate.

The State Respondents filed their answer on January 3, 2022. The State Respondents admit Petitioners' allegation that 87 percent of pork sold in California derives from pigs born and raised outside the state. Shubert likewise filed an answer.

On December 9, 2021, Petitioners served notice of a hearing on the merits. Shubert responded with a nonopposition. The State Respondents oppose.

<u>Discussion</u>

Petitioners seek a writ of mandate delaying enforcement of the Act's prohibition on sales of whole pork meat that the seller knows or should know derives from an animal confined in fewer than 24 square feet. Petitioners argue that the voters did not intend for the prohibition to become enforceable until 28 months after CDFA and CDPH have promulgated final regulations. They further argue that compliance with the prohibition would be difficult if not impossible without a system tracking pork from farms of origin to California suppliers. As Petitioners' experts explain in their declarations, there is currently no system in place that traces pork sold in California to a particular pig raised outside the state. Breeding pigs originating out of state are frequently raised on more than one farm, and they and their offspring change hands additional times before arriving as whole pork meat ready for sale in California. Consequently, Petitioners argue that suppliers cannot furnish reliable assurances that their pork products derive from pigs confined with at least 24 square feet per pig.

The State Respondents read the Act differently, and specifically dispute that final regulations are a precondition to enforcement. The State Respondents also argue that pork sellers' compliance with the Act is not impossible, and they suggest that Petitioners and their suppliers have had time to create their own interstate tracking system since the Act's approval in late 2018.

The rules for interpreting statutes apply to voter initiatives. (See *People v. Byucks* (2018) 5 Cal.5th 857, 879.) The court endeavors to effectuate the voters' intent, turning first to the measure's language, and giving the terms their ordinary meaning. (See *id.*, pp. 879-880.) "But the statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme." (*Id.*, p. 880.) In addition to giving effect to the measure's specific language, the court gives effect to its major and fundamental purposes. (See *id.*) An initiative's general statement of purpose is one guide, but not the only one, informing the voters' intent. (See *Gardner v. Schwarzenegger* (2009) 178 Cal.App.4th 1366, 1374.)

"'Absent ambiguity, [the court] presume[s] that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language.'" (*Professional Engineers in Calif. Gov't v. Kempton* (2007) 40 Cal.4th 1016, 1037, some brackets added.) "Where there is ambiguity in the language of the measure, '[b]allot summaries and arguments may be considered when determining the voters' intent and understanding of a ballot measure.'" (*Id.*, brackets in original.) While the court accords "weak deference" to an agency's statutory interpretation of its governing statutes "where its expertise gives it superior qualifications to do so," the issue is ultimately subject to de novo review. (*City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 500.)

Turning to the merits of the dispute, the Act's deadline on the promulgation of regulations is mandatory, as opposed to permissive. Section 25993(a) provides that CDFA and CDPH "shall"

jointly promulgate rules and regulations by September 1, 2019.[4] The term "shall" usually denotes a command, and the court discerns no contrary intent elsewhere in the Act's text. (See *Doe v. Albany Unified School Dist.* (2010) 190 Cal.App.4th 668, 676-677 [although "shall" ordinarily denotes a command, there may be cases in which it is intended differently].) To the contrary, given that the deadline on regulations falls shortly before the first square-footage requirement in Section 25991(e) took effect, it is easy to infer a mandate for pre-enforcement regulations.

Further, the regulations that the voters intended are regulations "for the implementation of this act... ." This language signals that the Act was not intended to be self-executing. (See *American Nurses Assn. v. Torlakson* (2013) 57 Cal.4th 570, 580 [statute that did not "require" implementing regulations was self-executing]; *Taylor v. Madigan* (1975) 53 Cal.App.3d 943, 950-951 [despite presumption that constitutional provisions are self-executing, and even where provisions may be enforced without legislation, directive for Legislature to enact an implementing statute overcomes the presumption]; *People v. Vega-Hernandez* (1986) 179 Cal.App.3d, 1084, 1092 [constitutional specification that "Legislature shall adopt provisions to implement this section during the calendar year following adoption of this section" was "clear" directive for legislation]; *Persky v. Bushey* (2018) 21 Cal.App.5th 810, 818 [rules for interpreting constitutional provisions are generally the same as those applicable to statutes].) To the extent any ambiguity exists in this regard, the Legislative Analyst's comments in the ballot pamphlet fortify the implication: "This measure also requires CDFA and [CDPH] to write regulations to implement its requirements." (Petitioners' RJN, Exh. A, p. 69.)

Despite textual evidence that the voters intended for implementing regulations to be in place before the Act's square-footage requirements took effect, the State Respondents argue that Petitioners should be subjected to criminal and civil penalties even without the benefit of such regulations. The State Respondents assert that much of the Act is clear enough to enforce without additional guidance from CDFA and CDPH. To be sure, the square-footage requirements and many of the Act's definitions are explicit. Nonetheless, the State Respondents' argument fails for two reasons.

First and foremost, the State Respondents' argument is inconsistent with textual evidence that the voters wanted regulations before the square-footage requirements took effect. Construing the Act's command for regulations as merely advisory would read the word "shall" out of the

---

[4] Neither side argues that the term "rules and regulations" as used in the Act was intended to denote anything other than regulations. The Legislative Analyst did not attribute any broader meaning to this term either. (See Ballot Pamphlet attached as Exh. A to Petitioners' RJN, p. 68 ["[The Act] [r]equires [the] State of California to issue implementing regulations"]; *id.*, Exh. A, p. 69 ["This measure also requires CDFA and the California Department of Public Health to write regulations to implement its requirements"].) Accordingly, the court does not construe "rules and regulations" to denote anything other than implementing regulations. But even if the voters expected CDFA and CDPH to promulgate rules other than final regulations, the outcome in this case would be the same.

text, and the court must endeavor to give every word in the text meaning. (See *Vega-Hernandez*, *supra*, p. 1092.)

Second, given that some of the Act's provisions are explicit, the command for regulations is best construed as one for the regulation of other provisions that are not explicit. The least explicit provisions in the Act encompass the "written certification" provision supporting the good faith defense. The Act leaves the term "written certification" undefined and does not advert to any system for producing such a document. Not surprisingly, the regulations that CDFA and CDPH have proposed contain numerous provisions trained on the production of a documentary audit trail, and would require any good faith defense to be based on these documents. Consequently, the State Respondents' current argument that the Act does not call for such regulations rings hollow.

Similarly, although the Act's "should know" element of liability is familiar to the courts, it is an affirmative command to exercise reasonable care that is amenable to regulation. (See *In re Jorge M.* (2000) 23 Cal.4th 866, 887-887 [although the point at which a person "should know" (s)he possesses an assault weapon depends on the surrounding facts, unhindered possession for a substantial period *imposes a duty of inquiry*].) Again, the Act offers no guidance about the steps sellers must take before they should know that a particular product is traceable to a breeding pig that at some point in the distribution chain was confined in fewer than 24 square feet.

The State Respondents would analogize the Act to statutes at issue in *Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, and *Fisher v. State Personnel Board* (2018) 25 Cal.App.5th 1. These two cases are distinguishable.

The statute in *Alfaro* required fingerprints and biological samples to be collected from enumerated criminal offenders. The statute further provided that named state agencies "shall adopt policies and enact regulations ... as necessary, to give effect to the intent and purpose of this chapter, and to ensure that [prints and biological samples] are collected from qualifying offenders in a timely manner... ." (*Alfaro*, p. 501.) In addition to concluding that the statute could be implemented without regulations, the Court of Appeal construed the specification to regulate "as necessary" as a discretionary grant limiting regulatory authority, rather than commanding it. (*Id.*, pp. 501-502.) Because the Act does not condition regulation on a determination of necessity, and because the Act imposes a deadline by which to regulate, it is materially different from the statute in *Alfaro*. (See *id.*, p. 503 [reasoning that an authorized agency's decision to enact regulations is discretionary "in the absence of an express legislative command"].)

*Fisher* involved an attorney who served as an administrative law judge while working for a law firm litigating in that court. On appeal from the decision terminating his ALJ duties, the attorney argued that provisions in the Government Code barring state employees from engaging in incompatible employment were not effective absent implementing regulations. (*Fisher*, pp. 14-16.) The statutory provisions in question did direct the California Department of

Human Resources to "adopt rules governing the application" of the bar on incompatible employment, but it also provided that "existing procedures shall remain in full force and effect" until the agency "adopts rules governing the application of this section[.]" (*Id.*, p. 16.) Given this, the Court of Appeal determined that the statute "was binding even before CalHR's implementation of rules governing the statute's application." (*Id.*) The Act in the instant case, in contrast, contains no reference to preexisting or alternative rules of implementation. Instead, its text and the accompanying ballot pamphlet materials describe mandatory regulations in effect prior to square-footage requirements governing sales.

For the foregoing reasons, the court concludes that the promulgation of joint regulations is a condition precedent to the enforcement of the square-footage requirement governing sales of whole pork meat pursuant to Sections 25990(b)(2) and 25991(e)(3).)

In terms of remedy, an ordinary writ of mandate pursuant to Code of Civil Procedure Section 1085 usually issues to compel a nonjudicial officer to perform a legally mandated ministerial duty. (See *Planned Parenthood Affiliates*, *supra*, 181 Cal.App.3d at 262.) Petitioners do not seek a writ compelling CDFA or CDPH to enact regulations, or to compel anyone else to perform an affirmative act. Nonetheless, "[t]he official's duty to perform a mandatory ministerial duty in accordance with law embodies a corollary duty to *not* perform the duty in violation of law. The lawful exercise of the ministerial duty may be compelled; the unlawful exercise of the duty may be restrained." (*Id.*, italics in original.) In other words, a prohibitory writ of mandate may be used restrain execution of an unlawful statute. (See *id.*, p. 263.) Accordingly, Petitioners are entitled to a writ of mandate barring Bonta, Shubert and local prosecutors statewide from enforcing the prohibition on intrastate sales of whole pork meat pursuant to Sections 25990(b)(2) and 25991(e)(3) until final regulations are enacted.

Petitioners pray for a writ barring enforcement of the square-footage provisions on whole pork meat sales until 28 months after CDFA and CDPH promulgate final regulations. Petitioners contend that a 28-month delay is appropriate because the Act's deadline to promulgate regulations falls 28 months before the date that the square-footage requirement took effect. Hence, Petitioners reason that the January 1, 2022 date in Section 25991(e)(3) was calculated to afford sellers 28 months to adjust to regulations. In the court's view, the January 1, 2022 date was calculated at least in part to allow producers to construct new enclosures after the Act took effect. Consequently, although the court agrees that Petitioners are entitled to a delay that extends past the date on which regulations are enacted, it disagrees that 28 months are required. The court must be mindful of the Act's concern about cruel confinements, and the enforcement delay must not exceed a period that is necessary.

The court's writ will remain in effect until 180 days after final regulations go into effect. After final regulations are enacted, the parties may return to this court for any appropriate adjustment to the date.

A writ directed at public prosecutors leaves Petitioners and their members open to private UCL lawsuits for restitution and injunctive relief. At oral argument, counsel debated whether the

court could or should address this remedial gap by reforming the Act so that the square footage requirement in Section 25991(e)(3) does not take effect until some point after regulations are enacted. Although he argued in favor of reformation, counsel for Petitioners suggested that a declaration of rights was similarly capable of warding off private lawsuits. Respondents' counsel argued that statutory reformation is an extraordinary remedy that is not suited to present circumstances.

The court accepts Petitioners' invitation to provide declaratory relief in lieu of an order reforming the Act. Declaratory relief is a cumulative remedy and is available notwithstanding the availability of a prohibitory writ of mandate. (See Code Civ. Proc. § 1062.) Accordingly, the judgment will include a declaration that Petitioners, their members, and their members' owners and operators are not subject to enforcement of the prohibition on sales of whole pork meat pursuant to Section 25990(b)(2), as defined Section 25991(e)(3), until 180 days after final regulations are enacted pursuant to Section 25993, subd. (a).

Disposition

The petition for a prohibitory writ of mandate is GRANTED in part and DENIED in part.

The first cause of action for a declaration of rights and duties is granted on the terms above.

The court will retain jurisdiction to modify the relief granted in light of changing circumstances.

Petitioners' third cause of action for an injunction shall is dismissed as duplicative.

Pursuant to Cal. R. Court 3.1312, counsel for Petitioners **shall serve** on the respondents / defendants **and then lodge** (1) for the court's signature a judgment to which this ruling is attached as an exhibit, and (2) for the clerk's signature a prohibitory writ of mandate.

Unless otherwise ordered, any administrative record, exhibit, deposition, or other original document offered in evidence or otherwise presented at trial, will be returned at the conclusion of the matter to the custody of the offering party. The custodial party must maintain the administrative record and all exhibits and other materials in the same condition as received from the clerk until 60 days after a final judgment or dismissal of the entire case is entered.

SO ORDERED.

Dated: January 24, 2022

Hon. James P. Arguelles
Judge of the Superior Court,
County of Sacramento