Exhibit 9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS RESTAURANT ASSOCIATION, HOSPITALITYMAINE, NEW HAMPSHIRE LODGING & RESTAURANT ASSOCIATION, RHODE ISLAND HOSPITALITY ASSOCIATION, RESTAURANT LAW CENTER, and the NATIONAL PORK PRODUCERS COUNCIL, <br><br>     Plaintiffs, <br><br> v. <br><br> MAURA HEALEY, in her Official Capacity as the Attorney General of Massachusetts, and JOHN LEBEAUX, in his Official Capacity as Commissioner of the Massachusetts Department of Agricultural Resources, <br><br>     Defendants. | Civil Action No. _____ |

**DECLARATION OF CASEY GALLIMORE**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Casey Gallimore, hereby declare as follows:

1.      I am providing this declaration, based upon my personal knowledge, in support of the Motion for Preliminary Injunction filed by the Massachusetts Restaurant Association and the other plaintiffs in the above-captioned matter. I offer this declaration based upon my deep and extensive knowledge, skill, experience, training, and education in the food industry, and in particular within the meat supply chain. In 2010, I graduated from Truman State University with a Bachelor of Science in Biology. For the past decade, I have worked principally within the meat sector of the food industry with a focus on regulatory compliance, and I have extensive experience

with traceability of meat products through the supply chain. From 2011 to 2013, I worked at the Kansas City Steak Company, a producer and distributor of premium beef, pork, and poultry, eventually rising to the position of Quality Assurance Manager; and I coordinated the company's extensive Hazard Analysis and Critical Control Points (HACCP) infrastructure, which is a central component of its ability to process meat and provide its customers with reliable supplies of safe products. From 2013 to 2017, I served as the Regulatory Food Safety Manager for Triumph Foods LLC and worked at the then second largest pork slaughter facility in the United States, where my primary responsibilities included overseeing the food safety program, regulatory compliance, orchestration of government and customer audits, and oversight of the implementation of a chain-wide electronic Quality Management System. At Triumph Foods LLC, I also served as the company's primary liaison to the U.S. Department of Agriculture, the Food and Drug Administration, and other government organizations and was deeply involved with the entire meat supply chain. Following my time at Triumph Foods LLC, I have served as the Director of Regulatory Policy at the North American Meat Institute, the oldest and largest trade association representing United States packers and processors of pork, beef, veal, lamb, and turkey. In this role, I provide members assistance, analysis, and guidance regarding regulatory compliance and policy on food safety, food defense, animal welfare, food quality, food processing, new technologies, and operational initiatives. I also currently serve on the National Advisory Committee on Meat and Poultry Inspection, which advises the Secretary of Agriculture on matters affecting federal and state inspection program activities.

2.    In order to provide this declaration, I reviewed Massachusetts General Laws Chapter 129 Appendix §§ 1-1 through 1-12 and the regulations adopted by the Massachusetts Department of Agricultural Resources interpreting same: 940 CMR §§ 36.00 through 36.10. The

2

focus of this declaration is M.G.L. c. 129 App. §§ 1-3(C), 1-6, 940 CMR § 35.04(1)(c), and the official guidance interpreting same[1] (the "Pork Rules").

3.     Massachusetts has no commercial swine industry to speak of. While there are a few farms that raise pigs in the state, they are either demonstration farms or small-scale operations offering artisanal products, mostly directly to consumers. They do not utilize the enclosures outlawed by the Pork Rules. Massachusetts is, however, home to several large pork distribution facilities that serve the New England market.

4.     The supply chain by which whole pork meat is produced and distributed from farm to table in the United States is complicated; the simplest supply chain involves at least seven steps:

    i.    the pigs must be born/weaned;

    ii.    they must be raised to market weight;

    iii.    they must be shipped to slaughter facilities;

    iv.    the pork products must be processed;

    v.    they must be packaged;

    vi.    they must be stored; and

    vii.    they must be shipped.

Although that is the simplest example, products are often processed or further processed at one or more subsequent facilities after the initial slaughter facility. Each time a product is processed at a subsequent facility, additional steps of receiving, processing, packaging, storing, and shipping are added. The supply chain extends further beyond seven steps when multiple distributors and meat buyers are involved. Each step in the supply chain becomes more complex when segregation is involved.

---

[1] "33 CMR 35.00 – FAQ," Mass. Dept. of Agricultural Resources, July 11, 2022 (available at *https://tinyurl.com/2tkyw54p*) (last accessed July 28, 2022).

5.    The supply chain begins at hog farms. In the United States, most pork originates from hogs from farms in Iowa, Minnesota, North Carolina, Illinois, Indiana, or Missouri. These farms vary greatly. Some are large and others are small. Some are independent and others are company-owned. Sows are cared-for, housed, and bred via a process which produces, on average, around 20 piglets per sow per year. These piglets are then raised to market weight. Sometimes that happens on the farm on which they were born. But often, after about 20 days, the piglets will be weaned and then transferred to a nursery farm. On average, they will stay at that nursery farm for about six to eight weeks. Afterward, they will travel again to a finishing farm, where they will stay for another 3½ or 4 months before heading to market. Overall, the entire period lasts for approximately six months.

6.    After the hogs reach market weight, they are shipped to a slaughter facility. Pork slaughter facilities typically receive hogs from hundreds of farms, both independent and company-owned, spread across an area of thousands of square miles. The hogs that arrive at a particular pork slaughter facility come from farms providing a wide variety of living conditions to the sows and market animals under their care. Upon arrival, the hogs are moved into one or more pens (depending upon the size of the pens at the slaughter facility).

7.    Once the market-weight hogs arrive at a pork slaughter facility, they are slaughtered and processed into a variety of pork products, ranging from hanging carcasses, sides, quarters, and general "primal" cuts of meats that may be processed at a subsequent facility into retail packaged cuts. Slaughter is completed primarily via a single production line at the pork processing facility. Very few pork slaughter facilities in the United States have more than one production line.

8.    After the pork is processed, it is packaged, labelled, and stored at the processing facility, and then shipped to distributors (and there could be many different distributors,

4

wholesalers, resellers, or others who trade these commodity products and take possession and control of any one cut of pork during its journey from the plant to the dinner plate), institutions, retailers, such as grocery stores and restaurants, or further processors. If the pork is shipped to a further processor, it will then be shipped to a distributor, institution, a subsequent further processor, or directly to a grocery store, restaurant, or individual consumer. If the processed pork is shipped to a pork distributor, it will be further distributed to end-users such as grocery stores, restaurants, or individuals. And if the processed pork is shipped directly to a grocery store or restaurant, it is then available for purchase by individuals.

9.    There are, therefore, at least seven steps in the United States pork supply chain. The pigs must be born/weaned, they must be raised to market weight, they must be shipped to slaughter facilities, the pork products must be processed, they must be packaged, they must be stored, and they must be shipped again. Given the complexity of his supply chain, it is difficult and expensive to comply with disparate requirements imposed by different states.

10.    On November 8, 2016, Massachusetts voters approved Question 3, the "Massachusetts Minimum Size Requirements for Farm Animal Containment," which included the Pork Rules codified as M.G.L. c. 129 App. §§ 1-3(C). This statute prohibits the sale in Massachusetts of "[w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." "Confined in a cruel manner" is defined in the statute as "confining… a breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely." M.G.L. c. 129 App. §§ 1-5.

11.     As it stands today, many sows in the United States are not housed in compliance with the Pork Rules.  Many farmers choose to keep sows in smaller individual pens during the period between weaning and confirmation of pregnancy.  They do this for both animal health and business reasons.  Sows in group housing can experience more injuries and fatalities than sows housed in breeding stalls because they are exposed to aggression.  Providing health care and critical nutrients to pregnant sows can be more difficult in group settings.

12.     M.G.L. c. 129 App. § 1-7 provides as follows: "It shall be a defense to any action to enforce this act that a business owner or operator relied in good faith upon a written certification or guarantee by the supplier that the shell egg, egg products, whole pork meat or whole veal meat at issue was not derived from a covered animal that was confined in a cruel manner or from the immediate offspring of a female pig that was confined in a cruel manner."

13.     On June 10, 2022, MDAR promulgated rules specifying the content of such certifications.  330 C.M.R. § 35.05.  In these same regulations, MDAR further defined "turning around freely" as being able to turn around "without touching the side of an Enclosure or another animal." 330 C.M.R. § 35.02 (emphasis added).

14.     The Pork Rules are scheduled to take effect on August 15, 2022.  M.G.L. c. 129 App. § 1-12.

15.     MDAR failed to issue a press release or otherwise publicize the regulations despite the fact that they were issued only approximately two months before the effective date of the statute.  MDAR did not even provide notice to those who participated in the comment process.  This left many in the industry without notice of the regulations.

16.     Then, on July 11, 2022, only weeks before the Pork Rules are scheduled to take effect, MDAR issued official guidance that, for the first time, interprets the Pork Rules to apply

to pork that is not even destined for consumption in Massachusetts.[2]  It was presented with the

following question: "My company sells whole pork meat and whole veal meat wholesale to a

Massachusetts company who only sells their products out of state (outside of Massachusetts), do

the regulations apply to us?" *Id.* It responded, "Yes… In this example, the buyer is in

Massachusetts and takes physical possession of the pork and veal in Massachusetts. Therefore,

the regulation applies." *Id.*

17.     Thus, in the newly announced official opinion of the agency authorized to

interpret the Pork Rules, Massachusetts law controls how pigs are farmed out-of-state even when

the meat is consumed out-of-state if that meat happens to pass through the hands of a

Massachusetts distributor.  This unexpected new rule, announced only approximately a month

prior to the effective date of the statute, would require very significant changes to the way that

the industry serves the New England market because Massachusetts is home to several large

distribution facilities that serve Rhode Island, New Hampshire, Maine, and Vermont.

18.     The official guidance issued on July 11, 2022 also explained for the first time that

MDAR considers ground pork (also called comminuted pork) to qualify as a "cut" of pork as that

term is used in M.G.L. c. 129 App. § 1-5.

19.     The official guidance issued on July 11, 2022 also explained for the first time that

MDAR intends to apply the Pork Rules to pigs born before the August 15, 2022 effective date

depending on whether their mothers are housed in compliant enclosures after that date.  In other

words, the meat of millions of pigs alive today will be deemed either compliant or non-compliant

depending on the future living conditions of their mothers.  There are 60,000 hog producers in

---

[2] "33 CMR 35.00 – FAQ," Mass. Dept. of Agricultural Resources, July 11, 2022 (available at
https://tinyurl.com/2tkyw54p) (last accessed July 20, 2022).

the U.S. and many pork packers source from hundreds of them. As explained above, many hog producers currently do not utilize group housing for a variety of reasons, animal welfare concerns among them. Imagine a pig born on March 1, 2022 that arrives at a packer's facility after the Pork Rules take effect on August 15, 2022. In order to identify Massachusetts-compliant pork, the packer would have to know which producer currently owns the sow that birthed that pig and determine whether that producer took steps to ensure that the sow's enclosure now complies with the Pork Rules, if the sow is even still in production at that time. The pork supply chain is presently unequipped to make this assessment. As a result, the meat from vast majority of the pigs alive today will be ineligible for sale in Massachusetts because it is all but impossible to draw the required connection between a given market pig and the current living conditions of its mother. A far more sensible approach to implementing the Pork Rules would be to have them apply only to pigs born after the date the rules take effect. Segregation of compliant and non-compliant pork throughout the supply chain is never easy, but it is made far simpler by starting at birth.

20.    In order to produce Massachusetts-compliant whole meat pork, many producers large and small have to alter their production practices and some have to renovate their production facilities. I understand that many are waiting for the Supreme Court to rule in *National Pork Producers Council, et al. v. Karen Ross, et al.*, No. 21-468 (U.S.) before formulating and implementing plans to comply with the demands of the Pork Rules. Moreover, the guidance issued on July 11, 2022 introduced enormous new compliance difficulties by seeking to apply Massachusetts law to pork that merely passes through the hands of a Massachusetts distributor and by taking the position that the legality of millions of pigs alive today will turn on the future living conditions of their mothers. Thus, with only weeks left before

8

Pork Rules go into effect, there will be an inadequate supply of Massachusetts-compliant pork to meet Massachusetts's demand by August 15, 2022 and likely for at least the remainder of 2022.

21.    Adjustments to the pork supply chain are complicated and expensive. After a sow enclosed in a Massachusetts-compliant pen gives birth to a litter of piglets, pork distributors will have to ensure that Massachusetts-compliant hogs are segregated from non-compliant hogs until the meat of those Massachusetts-compliant hogs is delivered to grocery store shelves and restaurant kitchens.

22.    Massachusetts-compliant hogs will have to be segregated from non-compliant hogs as they are raised to harvest weight. This will require farms that raise the hogs born on the farm to keep the Massachusetts-compliant hogs segregated from the non-compliant hogs for the entire six months that they spend on the farm. It will also require farms that sell some of their hogs to other finishing farms to create, maintain, and transfer to the finishing farms records certifying that those hogs are Massachusetts-compliant.

23.    Massachusetts-compliant hogs will then have to be segregated from non-compliant hogs as they are shipped from production facility to processing facility. It will also require the transportation services, some run by a single individual (one man and a truck), to create, maintain, and transfer to the processing facility records sufficient to demonstrate that the hogs being delivered are, in fact, Massachusetts-compliant.

24.    As the hogs arrive at a processing facility for slaughter, they will have to remain segregated in time and space. The processing facility will have to coordinate deliveries from the hundreds of independent farms spread over thousands of square miles who deliver hogs for slaughter to a particular processing facility and ensure that they all deliver around the same time. Only after perfecting the process of time segregation could all of the Massachusetts-compliant

9

hogs (which will likely be only a portion of the hogs at a particular facility) be processed during a particular part of a day and the non-compliant hogs be processed during another part of a day. If unable to coordinate delivery by time, the processing facility will likely have to construct additional pen space or, at a minimum, retrofit existing pen space to allow Massachusetts-compliant hogs that have been delivered to the facility to remain segregated while awaiting processing.

25.     Compliance with the Pork Rules will also necessitate segregating the carcasses as they are processed, which will require either (1) sufficient processing floor downtime to ensure that non-compliant product is clear of the floor before and after Massachusetts-compliant hogs are processed or (2) the creation of an entirely separate production line. Only the largest pork processing facilities in the world have more than one production line, and even those have only two production lines. Adding a new production line at each pork processing facility for Massachusetts-compliant pork before August 15, 2022, would be impossible. Therefore, processing facilities using time and space segregation will have to institute a sufficient break between the processing of Massachusetts-compliant hogs and the processing of non-compliant hogs to prevent mixing of Massachusetts-compliant and non-compliant product. A break sufficient to ensure that no non-compliant product has been mixed in with Massachusetts-compliant product will vary across different facilities based on process and design, but in all cases will be substantial. With processing facilities harvesting more than 1,000 hogs per hour, these breaks will be incredibly costly.

26.     After segregating Massachusetts-compliant hogs from non-compliant hogs as they are raised to market weight, shipped to slaughter facilities, and processed, the Massachusetts-compliant whole pork meat products will then have to be kept separate from the non-compliant

whole pork meat products and, to ensure that they remain separate until purchased by a Massachusetts end-user, likely labelled. This will require pork distributors to alter their distribution and inventory management systems such that they can accommodate duplicate item codes and SKUs (stock keeping units)—one for Massachusetts and the states that it distributes into, and one for every other state—for every one of the pork distributor's covered pork products.

27.     If the products are labelled, as retailers could require, so as to best ensure segregation of Massachusetts-compliant pork throughout the distribution process, pork establishments will have to obtain the U.S. Food Safety and Inspection Service's ("FSIS") approval of the proposed labels. Because any label offering information regarding compliance with the Pork Rules would include an animal raising claim, FSIS would be required to approve that claim before it could be made. As provided in the FSIS labeling guidance attached hereto as <u>Exhibit A</u>, a substantial amount of information must be compiled and provided to FSIS in support of any animal raising claim before such claim can be approved.[3] This application and approval process will require considerable time. The current average turnaround for FSIS sketch label approval is 3-5 business days once all required information has been compiled and provided. However, if the many establishments producing whole pork meat products sold into Massachusetts all submit labels for approval upon final regulations, FSIS labeling staff will be overwhelmed and delayed

---

[3] *See* Exhibit A at 6 ("For most animal raising claims, the documentation typically needed to support these claims is:
    1. A detailed written description explaining the controls used for ensuring that the raising claim is valid from birth to harvest or the period of raising being referenced by the claim;
    2. A signed and dated document describing how the animals are raised which may include feed formulations (e.g., vegetarian fed, raised without antibiotics, grass fed), to support that the specific claim made is truthful and not misleading;
    3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution;
    4. A written description for the identification, control, and segregation of non-conforming animals/product; *and*
    5. If a third-party certifies a claim, a current copy of the certificate from the certifying organization.") (emphasis added).

approvals are likely. Many retail and other labels are produced by third parties and will have to be produced and shipped to the establishments once approved.

28.     Pork establishments and distributors will also have to set aside additional space in their warehouses and distribution centers to store pork specifically destined for Massachusetts to ensure segregation is maintained. And before the Massachusetts-compliant pork is shipped from the processing facility to another processor, a distributor, or a retailer, the processing facility/distributor will have to create, maintain, and transfer records sufficient to demonstrate the pork being shipped is, in fact, Massachusetts-compliant. Once shipped to Massachusetts, Massachusetts-compliant products will still have to remain segregated, forcing pork distributors to devise new configurations for their limited pallet and truck space.

29.     Ensuring that Massachusetts-compliant pork is segregated, and that there are records sufficient to demonstrate that the Massachusetts-compliant pork was segregated (1) when it was born, (2) while it was raised to market weight, (3) while it was shipped to slaughter facilities, (4) while it was processed, (5) while it was labelled and packaged, (6) while it was stored, and (7) while it was shipped to end-users such that pork producers and distributors can submit truthful self-certifications, necessitates an overhaul of pork producer and distributor operations and practices nationwide.

30.     In light of the above, it is impossible to make the significant changes required by the regulations promulgated on June 10, 2022 and the official guidance issued on July 11, 2022 by August 15, 2022. The industry is simply too large and complex for such changes to be made on an *ad hoc* basis in the coming weeks. Abrupt enforcement of the Pork Rules would lead to supply chain disruption. Accordingly, implementation of the Pork Rules should follow the Supreme Court's decision concerning the constitutionality of California's very similar statute in order to

avoid potentially needless compliance costs and market disruption and to ensure the continuous supply of pork to Massachusetts and neighboring states.

In accordance with 28 U.S.C. § 1746(1), I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 1, 2022

Casey Gallimore

13

Exhibit A

(to Declaration of Casey Gallimore)

# Food Safety and Inspection Service Labeling Guideline on Documentation Needed to Substantiate Animal Raising Claims for Label Submissions

# December 2019





This guideline is designed to help establishments determine:

- The supporting documentation needed when submitting labels that bear an animal raising claim.

- How to add additional suppliers to a label with an animal raising claim that has been approved.

# FSIS Compliance Guideline for Label Approval

## Table of Contents

Preface................................................................................................................ 3

Documentation Needed to Substantiate Animal Raising Claims for Label Submission... 6

    Animal Welfare and Environmental Stewardship……………………………..…… 7

    Breed…………………………………………………………………………… 8

    Diet………………………………………………………………………… 9

    Living/Raising/Raising Conditions………………………………………………… 10

    Negative Antibiotics Use - Livestock/Red Meat……………...…………………12

    Negative Antibiotics Use - Poultry…………………………..…………………… ..12

    Negative Hormones Use……………………………………………………… 13

    Source/Traceability………………………………………………………… 14

    Third-Party Certification…………………………………………………… 15

    Organic…………………………………………………………………...… 15

Adding a New Supplier…………………………………………………………… 16

Label Example…………………………………………………………………… 17

Additional Resources .......................................................................................... 18

# Preface

## What is the purpose of this Compliance Guideline?

The purpose of this compliance guideline is to outline the documentation that establishments need to submit in support of label applications for products that bear animal raising claims. The Food Safety and Inspection Service (FSIS) is the Agency in USDA with the responsibility for ensuring that the labeling of meat and poultry products is truthful and not misleading. Labeling bearing claims referring to the way that the source animal for a meat or poultry product was raised need to be evaluated and approved by FSIS prior to use.

**Key Points**
The following are examples of animal raising claims that are required to be approved by FSIS prior to use in commerce:

1. *Raised Without Antibiotics*
2. *Organic*
3. *Grass Fed*
4. *Raised Without the Use of Hormones*

For the past 25 years, FSIS has evaluated animal raising claims by considering information on animal raising practices submitted by companies as part of their label approval requests. The Agency has approved such claims if the animal raising information submitted with the label application supported the claim being made and the claim is truthful and not misleading.

FSIS developed this guideline to respond to numerous requests to the Labeling Program and Delivery Staff (LPDS) through phone calls, askFSIS questions, and other correspondence regarding the type of information needed to support the approval of labels bearing animal raising claims. This guideline is intended to facilitate the approval process for labels bearing animal raising claims. The information in this guideline is provided as guidance to assist meat and poultry establishments and is not legally binding from a regulatory perspective.

## Who is this guideline designed for?

This guideline is for establishments that are designing or modifying meat or poultry product labels with animal raising claims. The establishment must determine what supporting documentation is required for the various types of animal raising claims. This guideline will assist the establishment in making this determination.

## How will FSIS verify whether establishments meet requirements related to this guideline?

FSIS in-plant personnel verify that establishments comply with labeling regulations, when performing the General Labeling task assigned through the Public Health Information System (PHIS). For product bearing animal raising claims, in-plant personnel verify whether establishments maintain an FSIS approved label on file. Animal raising claims are special statements and claims that establishments are

3

required to submit to FSIS for approval for compliance with 9 CFR 412.1, USDA's Label Approval Regulations.

## Changes made to the guideline from the previous version

After reviewing the comments received, FSIS has revised the guideline by section as follows:

- Product Labeling: Use of Animal-Raising Claims on the Labels of Meat or Poultry Products
  o Added information about labeling needed for products bearing claims certified by third-party organization, including when products certified as "organic" need to disclose the certifying entity's website address on the product label.
  o Added information about carrying claims forward on additional products.
  o Removed age claims section because establishments are not using these claims.
  o Animal Welfare and Environmental Stewardship Claims:
    o Added descriptive language or information (terminology) that should accompany these claims to explain the meaning of the claim to consumers, including the type of information that needs to appear on the label when the product is certified by a third-party organization.
  o Breed claims:
    o Added information about carrying these claims forward to other products.
  o Living- or Raising-Condition Claims:
    o Reorganized section for clarity regarding labeling terminology and recommended documentation for approval.
    o Added information about additional terminology that typically accompanies these claims to explain the meaning of the claim to consumers, including where the information must appear on the label.
    o Added information on the use of "Free Range" and synonymous claims ("Free Roaming," "Pasture Fed," Pasture Grown," "Pasture Raised," and "Meadow Raised") on labels of poultry products and the documentation needed to substantiate these claims.

  o Raised Without Antibiotics – Livestock/Red Meat or Poultry:
    o Added "Raised Antibiotic Free" and "No added antibiotics" as examples of claims that may be used to disclose the fact that animals were not administered antibiotics at any point in the animal production process.
    o Added information on claims that include the term "sub-therapeutic antibiotics" to ensure that consumers understand that the claim means that antibiotics may only be administered in the event of an illness and includes the circumstances for which FSIS will approve labels bearing these claims.
  o Raised Without Hormones (No Hormones Administered or No Steroids Administered):
    o Updated information to clarify that FSIS will no longer require a qualifying statement on pork products labeled with "raised without hormones" claim because Federal law permits the use of certain hormones in swine, e.g., for gestation.

4

- o Added new examples of this type of claim.
- o Updated information to clarify why a qualifying statement is necessary for products made from a kind or species for which Federal law prohibits hormone use and to emphasize that this information must be displayed on the label in a manner that is likely to be read and understood by the ordinary individual for FSIS to approve the claim..
- o Third-Party Certification:
  - o Added information about documentation needed to support labels bearing animal raising claims that have been "Verified" or "Certified" by third-party organizations.
  - o Added information about "organic" claims, including other claims that could be substantiated with an Organic Certificate.
- o Added section on procedures for adding an additional supplier for a label with animal-raising claims that was previously approved by FSIS.


The updated guideline is posted at: https://www.fsis.usda.gov/wps/portal/fsis/topics/regulatory-compliance/compliance-guides-index/. FSIS will update this document, as necessary.

## What if I still have questions after I read this guideline?

If the desired information cannot be found within the Compliance Guideline, FSIS recommends that users search the publicly posted Questions & Answers (Q&As) in the askFSIS database or submit questions through askFSIS.  Documenting the questions helps FSIS improve and refine present and future versions of the Compliance Guideline and associated issuances.

When submitting a question, use the **Submit a Question** tab, and enter the following information in the fields provided:

SubjectField:     "**Documentation Needed to Substantiate Animal Raising Claims**"
QuestionField:  Enter question with as much detail as possible.
ProductField:    Select **Labeling** from the drop-down menu.
CategoryField:   Select **Labeling Regulations, Policies and Claims** from the drop-down menu.
Policy Arena:    Select **Domestic (U.S.) only** from the drop-down menu.

When all fields are complete, press **Continue.**

## Congressional Review Act

    Pursuant to the Congressional Review Act at 5 U.S.C. 801 et seq., the Office of Information and Regulatory Affairs has determined that this guideline is not a "major rule," as defined by 5 U.S.C. 804(2).

**Product Labeling: Use of the Animal Raising Claims on the Labels of Meat and Poultry Products**

A Federal establishment is required to use labels that are in compliance with the Federal Meat Inspection Act (FMIA; 21 U.S.C. § 601, 607) and the Poultry Products Inspection Act (PPIA; 21 U.S.C. § 451, 457) (the Acts), and the implementing regulations. Requirements include all mandatory labeling requirements as prescribed in Title 9 of the Code of Federal Regulations (CFR) section 317.2 and Part 381 Subpart N.

Although FSIS does not exercise its authority of prior label approval to point of purchase materials (e.g., pamphlets and placards) displayed in conjunction with products sold at retail and bearing animal raising claims, FSIS does require these materials be neither false or misleading, in compliance with the Acts and Federal regulations.

As stated in 9 CFR 412.1, labels with special statements and claims are required to be approved by FSIS prior to use in commerce.

Labels bearing animal raising claims are required to be submitted to LPDS with specific documentation to support all animal raising claims that appear on that label. Examples of animal raising claims include, but are not limited to: *Raised Without Antibiotics, Grass Fed, Free-Range, and Raised Without the Use of Hormones.* For most animal raising claims, the documentation typically needed to support these claims is:

1. A detailed written description explaining the controls used for ensuring that the raising claim is valid from birth to harvest or the period of raising being referenced by the claim;

2. A signed and dated document describing how the animals are raised which may include feed formulations (e.g., vegetarian fed, raised without antibiotics, grass fed), to support that the specific claim made is truthful and not misleading;

3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution;

4. A written description for the identification, control, and segregation of non-conforming animals/product; and

5. If a third-party certifies a claim, a current copy of the certificate from the certifying organization.

NOTE: If the claim was certified by a third-party certifying organization, FSIS will not approve the label bearing the claim if it does not include the certifying entities name, website address,[1] and logo, when the organization has a logo. An asterisk or other symbol must connect the claim to this information.

---

[1] Products certified as "organic" would not need to disclose a website address on the label, except when the address is required under 7 CFR Part 205.

In general, a purchased product bearing an approved animal raising claim may be used to support the claim in lieu of numbers 1 – 3 above. If a company purchases product bearing animal raising claims and would like to carry forward those claims onto its labeled product, the company needs to provide a copy of the purchased product label and segregation procedures when entering their federal establishment. However, companies cannot carry forward certified claims, logos and/or websites from purchased products that are certified by a third-party entity unless the companies that are carrying the claim forward are also under that same certification.  Companies cannot carry forward USDA organic claims, logos and/or websites without being certified organic themselves.

**Types of Animal Raising Claims and Guideline on the Documentation Needed to Substantiate the Claims**

**Animal Welfare and Environmental Stewardship**

These claims describe how animals are raised based on the care they receive by the producer or how the producer maintains the land and replenishes the environment.

FSIS has not defined these claims in regulations or policy guidelines. For animal welfare claims, such as "Raised with Care," or environmental stewardship claims, such as "Sustainably Raised," FSIS will only approve a claim if a statement is provided on the label showing the name of the entity that established the standard and includes additional terminology explaining the meaning of the claim for consumers, e.g., "TMB Ranch Defines Raised with Care/Sustainably Raised as [explain the meaning of the claim on the label]." If the entity has a website that describes the standards used to define the claim, the label may provide the website address instead of explaining what the claim means on the product label, e.g., "Raised with Care as defined by TMB Ranch at: [website address]."  As an alternative, animal welfare and environmental stewardship claims can be certified by a third-party certifying organization that posts the standards used to define the claim on its website.  If the claim is certified by a third-party certifying organization, FSIS will not approve the label bearing the claim if it does not include the certifying entities name, website address, and logo, when the organization has a logo.

The claims may appear on any panel of the package. The additional terminology that explains the meaning of the claim may appear with the claim or may be connected to the claim by an asterisk or another symbol and placed elsewhere on the same panel that bears the claim.  For example, if a claim is made on the principal display panel (PDP), the part of the label most likely to be seen by consumers when offered for retail sale, the explanation of the claim's meaning may be placed with the claim or placed elsewhere on the PDP provided the claim and explanation are connected by a symbol. If the claim is certified by a third-party certifying organization, an asterisk or other symbol must connect the claim to the certifying entities name, website address, and/or logo, when the organization has a logo, for FSIS to be able to approve the label.

Examples of these types of claims include, but are not limited to: Humanely Raised*, Sustainably Farmed*, and Raised with Environmental Stewardship*.

7

*TMB Ranch defines "Humanely Raised"/"Sustainably Farmed/Raised with Environmental Stewardship" as [insert description of standards used to define the claim]

Documentation needed:

1. A detailed written description explaining the meaning of the animal welfare or environmental stewardship claim and the controls used for ensuring that the raising claim is valid from birth to harvest; or the period of raising being referenced by the claim;
2. A signed and dated document describing how the animals are raised to support that the claims are not false or misleading;
3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution; and
4. A written description for the identification, control, and segregation of non-conforming animals/product (e.g., how animals not raised in accordance with the specific animal welfare guidelines or stewardship program are segregated from animals eligible to bear the claim).

## Breed

Breed claims refer to the declaration of a specific breed of livestock or poultry.

Examples of this type of claim include, but are not limited to: Angus, Wagyu (American Kobe), Hereford, Berkshire, Duroc, Muscovy, Silkie, and heritage poultry, pork or beef breeds.

Documentation needed:

1. A signed and dated document that substantiates the breed claim, e.g., under a Agricultural Marketing Service (AMS) Certified Meat and Poultry Program or a certificate from a breed organization;
2. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution;
3. Documentation to support the breed by phenotype (for example, hide color) or genotype (traceable to one registered parent or two registered grandparents with a breed association); and
4. A written description for the identification, control, and segregation of non-conforming animals/product.

Alternatively, a purchased product label may be used in lieu of numbers 1 – 3 above. If a company purchases product bearing a breed claim and would like to carry forward the claim on to their product, the company needs to provide a copy of the purchased label and segregation procedures for product entering the federal establishment when submitting for label approval.

NOTE: See label example

**Diet**

Diet claims refer to what animals are fed prior to harvest and processing. These claims require that the animals only eat the diet claimed for the lifetime of the animal, with the exception of milk consumed prior to weaning.

FSIS considers Grassfed, Grass Fed and Grass-Fed synonymous terms. "Grass Fed" or "100% Grass Fed" claims may only be applied to meat and meat product labels derived from cattle that were only (100%) fed grass (forage) after being weaned from their mother's milk. The diet must be derived solely from forage, and animals cannot be fed grain or grain by-products and must have continuous access to pasture during the growing season until slaughter. This means 100% grass-fed animals are never confined to a feedlot. Forage consists of grass (annual and perennial), forbs (e.g., legumes, Brassica), browse, or cereal grain crops in the vegetative (pre-grain) state. Hay, haylage, baleage, silage, crop residue without grain, and other roughage sources may also be included as acceptable feed sources. Routine mineral and vitamin supplementation may also be included in the feeding regimen. If incidental supplementation occurs due to inadvertent exposure to non-forage feedstuffs or to ensure the animal's wellbeing at all times during adverse environmental or physical conditions, the producer should provide a signed and dated document to the establishment attesting the above incident is not a routine occurrence. The establishment should include this information as part of the labeling documentation verifying the product qualifies for a grass fed claim.

When animals have less than 100-percent access to grass or forage the partial "grass fed" claim must accurately reflect the circumstances of raising, e.g., "Made from cows fed 85% grass and 15% corn."

The claim "Grass Finished" is not the same as "Grass Fed" because animals that are "grass finished" can be fed grain, in which case the claim "Grain Fed, Grass Finished" would be truthful and not misleading.

Historically, the AMS Grass (Forage) Fed Marketing Claim Standard was considered one form of proof to FSIS that the claim "grass fed" was truthful and not misleading. In January 2016, AMS withdrew the standard. This change did not change FSIS's documentation requirements for companies wishing to label their products as "Grass Fed."

Examples of this type of claim include, but are not limited to: Grass (Forage) Fed, Grain Fed, Vegetarian Feed, Raised Using Vegetarian Feeds [This means all vegetable feeds and no animal products (e.g., whey) are fed to the animal.], Raised Using Vegetarian Feeds (with a disclaimer to clarify animal products are fed to the animal for a certain period of time, e.g., "except for dairy products fed from birth to eight weeks" or "after 8 weeks"), and Fed No Animal By-Products.

Documentation needed:
1. A detailed written description explaining controls for ensuring that the raising claim is valid from birth to harvest or the period of raising being referenced by the

claim; (e.g., controls to ensure cattle that are supposed to be raised 100% grass fed are not fed grains);

2. A signed and dated document describing the diet of the animals to support that the claims are not false or misleading;
3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution; and
4. A written description for the identification, control, and segregation of non-conforming animals/product.

As an alternative, a producer may use the USDA Process Verified Program (PVP) (carried out by AMS) to verify their product meets their own grass-fed standard in lieu of documentation needed for 1-4 above. The USDA PVP is a voluntary, user-fee verification service that offers applicants a unique way to market their products to customers using clearly defined, implemented, and transparent process points.  An applicant's program may include one or more agricultural processes or portions of processes independently verified by a qualified AMS auditor. Examples of process points include, but are not limited to: adherence to a recognized standard or one created by a company or organization; definitions included within this guidance; a production, raising and/or handling practice that provides specific information to consumers to enable them to make informed decisions on the products that they buy; or a characteristic, practice, or requirement that is specifically requested by a customer or consumer. AMS auditors conduct a comprehensive review of a company's program, which includes an on-site audit of all facilities and phases of the operation that impact process verified points. Additional information about the USDA PVP service, shield, certificate, and official listing are available at www.ams.usda.gov/services/auditing/process-verified-programs.

There are a number of private third-party certification programs that accomplish the same objectives. If the claim is certified by a third-party organization, an asterisk or other symbol must connect the claim to the certifying entities name, website address, and/or logo, when the organization has a logo.

NOTE: See label example

**Living/Raising/Raising Conditions**

These claims refer to the environment in which the animals or birds were raised during their lifespan.

Examples of this type of claim include but are not limited to:  Cage or Crate Free, Free Range**, Not Confined, Free Roaming, Pasture Fed, Pasture Grown, Meadow Raised, and Pasture Raised.

NOTE: For all of the above claims, additional terminology is necessary on the label to define its meaning on livestock products and to convey that the animals were never confined to a feedlot.
Because FSIS has not defined these claims in the regulations or policy guidelines, nearly all living/raising conditions claims need to describe the standards used to define

that claim as applied to that particular product, e.g., "Cage free. Chickens were never confined to cages during raising." The information must appear with the claim or be connected by a symbol on the same panel on which the claim appears. As an alternative, these living/raising claims can be certified by a third-party certifying organization that posts its standards for defining the claim on its website.  If the claim is certified by a third-party certifying organization, FSIS will not approve the label bearing the claim if it does not include the certifying entity's name, website address, and logo, when the organization has a logo. An asterisk or other symbol must connect the claim to this information.

\*\*Based on consultations with AMS, FSIS determined that additional terminology is not needed on the label for the claim Free Range or synonymous claims ("Free Roaming," "Pasture Fed," Pasture Grown," "Pasture Raised," and "Meadow Raised") on poultry products. However, for FSIS to approve these claims, additional documentation must be submitted to substantiate the claim. Specific details about what additional information is needed is provided below.

Documentation needed:
1. A detailed written description explaining controls for ensuring that the animals are raised in a manner consistent with the meaning of the raising claim that is valid from birth to harvest or the period of raising being referenced by the claim.
2. A signed and dated document describing how the animals are raised to support that the claims are not false or misleading;
3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution; and
4. A written description of the identification, control, and segregation of non-conforming animals/product.

As part of 1 or 2 above, for the claim Free Range on poultry products, the documentation must describe the housing conditions for the birds and demonstrate continuous, free access to the outside throughout their normal growing cycle. During the winter months in a northern climate, birds are not free range if they stay in poultry housing or coops all winter. Producer documentation to support the use of the claim for birds raised in a northern climate during winter months would also need to describe the housing conditions for the birds and demonstrate continuous, free access to the outside throughout their normal growing cycle.

As part of 1 or 2 above, for the claims Free Roaming, Pasture Fed, Pasture Grown, Pasture Raised, and Meadow Raised on meat or poultry products, documentation that will typically substantiate these claims will show that the animals or birds have continuous, free access to the outdoors throughout their usual grow-out period. For ruminants, this means the entire grazing season for the geographical area.

NOTE: See label example

11

**<u>Negative Antibiotics Use – Livestock/Red Meat</u>**

*<u>Raised Without Antibiotics:</u>*
To use this claim, source animals cannot be administered antibiotics in their feed, water or by injections at any point in the production process.  This includes ionophores which are recognized as antibiotics by FSIS.

Examples of this type of claim include, but are not limited to: Raised Without Antibiotics, No Antibiotics Administered, No Added Antibiotics, No Antibiotics Ever and Raised Antibiotic Free.

*<u>No Sub-Therapeutic Antibiotics:</u>*

FSIS will approve a claim that states that animals have not been administered sub-therapeutic antibiotics if the claim is part of a complete claim that explain what the term "sub-therapeutic" means, e.g., "No sub-therapeutic antibiotics. Animals do not receive antibiotics on a daily basis; animals only receive antibiotics in the case of illness." Other examples of this claim that FSIS is likely to find to be truthful and not misleading include: "Beef Raised with No Sub-Therapeutic Antibiotics Ever, animals may be given antibiotics for the treatment of illness" or "Beef Raised with No Sub-Therapeutic Antibiotics, Animal do not receive antibiotics on a daily basis only in the case of illness."

Documentation needed:
1. A detailed written description explaining controls for ensuring that the animals are not given antibiotics from birth to harvest or the period of raising being referenced by the claim including feed formulation;
2. A signed and dated document describing how the animals are raised to support that the claims are not false or misleading;
3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution; and
4. A written description for the identification, control, and segregation of non-conforming animals/product (e.g., if beef raised without the use of antibiotics need to be treated with antibiotics due to illness).

NOTE: See label example

**<u>Negative Antibiotics Use – Poultry</u>**

*<u>Raised Without Antibiotics</u>*

For FSIS to find this claim to be truthful and not misleading, source animals cannot be administered antibiotics in their feed, water, or by injections.  Animals cannot be administered Ionophores, which are recognized as antibiotics by FSIS.

Examples of this type of claim include: Raised Without Antibiotics, No Antibiotics Administered, No Added Antibiotics, No Antibiotics Ever, and Antibiotics Free.

*<u>No Sub-Therapeutic Antibiotics:</u>*

This claim requires additional explanation on the label to ensure consumers understand antibiotics will be administered to the animals in the event of illness. Examples of this claim include: "Turkey Raised with No Sub-Therapeutic Antibiotics Ever, birds may be given antibiotics for the treatment of illness" or "Chicken Raised with No Sub-Therapeutic Antibiotics, birds do not receive antibiotics on a daily basis only in the case of illness."

Documentation needed:
1. A detailed written description explaining controls for ensuring that the raising claim is valid from birth to harvest; or the period of raising being referenced by the claim;
2. A signed and dated document describing how the animals are raised without antibiotics to support that the claims are not false or misleading;
3. A written description of product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution; and
4. A written description for the identification, control, and segregation of non-conforming animals/product (e.g., if chicken raised without the use of antibiotics need to be treated with antibiotics due to illness).

In addition to the documentation listed above, the establishment needs to submit a company letter (signed and on company letterhead) answering the following questions:

1. Do you use antibiotics pre-hatch in any way with respect to the eggs that you hatch for the poultry that will bear the claim?  If so, please describe how you use antibiotics?

2. Do you inject any vaccines *in ovo*?  If so, please state whether any of the vaccines includes an antibiotic.  If any of them does, please state what antibiotics are used, what the antibiotics are used for, and in what amount they are used.

3. Do you inject any antibiotics *in ovo*?  If so, please state what antibiotics are used, what the antibiotics are used for, and in what amount they are used.  What is the withdrawal time for the antibiotics?

4. Have you verified that the poultry that you use to produce your products was not derived from eggs or poultry that were injected or otherwise treated in any way with antibiotics?  If so, how have you verified these conclusions?

NOTE: See label example

### Negative Hormones Use

Under Federal law, hormones are only approved for use in beef cattle, swine***, and lamb production.  There are no hormones approved for use in the production of poultry, goat, veal calves, mature sheep, or exotic, non-amenable species (such as bison, buffalo, elk, and venison). Thus, additional terminology is necessary on these labels to convey that Federal law prohibits hormone use in these species.

FSIS will only approve a negative hormone claim on products made from a kind or species for which Federal law prohibits hormone use when it is accompanied by the qualifying statement: "There are no hormones approved for use in (kind or species [poultry, goat, veal, mature sheep, or exotic, non-amenable]) by Federal Regulations." The qualifying statement must be prominently and conspicuously displayed on the label, e.g., it appears adjacent to the claim or is in type at least one-third the height, in accordance with 9 CFR 317.2(b) for meat products or 9 CFR 381.116(b) for poultry products. As for any labeling claim, FSIS confirms compliance with these regulations during the label approval process.

***NOTE: In the previous draft of this guideline, FSIS stated that no hormones had been approved for use in the production of swine. After additional research, FSIS has found that there are several hormones approved by the Food and Drug Administration and marketed by drug makers to be used in swine in the United States for various reasons (e.g., gestation). Establishments do not need to resubmit their labels for approval to remove the previously required disclaimer statement from pork product labels. The change can be made generically under 9 CFR 412.1.

Examples of this type of claim include: Raised Without Added Hormones, No Added Hormones Administered, Raised Without Steroids.

Documentation needed:
1. A detailed written description explaining controls for ensuring the animals are raised without hormones or steroids to support the claim is valid from birth to harvest; or the period of raising being referenced by the claim;
2. A signed and dated document describing how the animals are raised (e.g., without the use of hormones) to support that the claims are not false or misleading;
3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution; and
4. A written description for the identification, control, and segregation of non-conforming animals/product.

NOTE: See label example

## Source/Traceability

This type of claim demonstrates how the animal can be traced back to its farm of origin from birth to slaughter/harvest.

Examples of this type of claim include: Source Verified and Traceable to [Name of Farm of Origin].

Documentation needed:
1. A detailed written description explaining controls for ensuring the source of the animal can be verified from birth to harvest or the period of raising being referenced by the claim;
2. A signed and dated document describing how the animals are raised to support that the claims are not false or misleading;

14

3. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution; and
4. A written description for the identification, control, and segregation of non-conforming animals/product; and
5. Live animal raising records demonstrating how individual animals or a group of animals are identifiable and traceable to their farm or ranch of birth, and if verified, the individual or entity verifying the claim.

NOTE: See label example

### Third-Party Certification

Generally, FSIS accepts animal raising claims verified by a third-party auditing or certifying program.  The standards for acceptance of the third-party certifier need to be credible and reliable. FSIS evaluates certifiers' acceptance standards as necessary to assess suitability for animal raising claims on labels. The label bearing the claim needs to include the certifying entity's name, website address, and logo, when the organization has a logo. An asterisk or other symbol must connect the claim to this information.

Examples of this type of claim include but are not limited to: USDA PVP (administered by AMS), Animal Welfare Approved (AWA), or GAP Step ratings (Global Animal Partnership (GAP)).

Documentation needed:

1. A current copy of the certificate; and

2. A written description of the product tracing and segregation mechanism from time of slaughter or further processing through packaging and wholesale or retail distribution.

NOTE: If used in conjunction with any other animal raising claim(s) that are not covered by the third-party organization certification, refer to the documentation needed for the particular claim(s). However, third-party certification cannot be carried over to other products unless the company has the same certification.

NOTE: See label example

### Organic

USDA organic regulations describe the specific standards required for a company to use the word "organic" or the USDA organic seal on food, feed, or fiber products.  See https://www.ams.usda.gov/services/organic-certification and/or https://www.ams.usda.gov/rules-regulation/organic/labeling.

The USDA organic regulations are administered by AMS's National Organic Program (NOP) and described at 7 CFR Part 205. For animal products to be labeled as organic, livestock producers must be certified organic and any operations that subsequently handle the organic product must be certified organic (e.g., slaughter plants, meat

15

packing facilities). Organic operations are inspected annually by USDA-accredited certifying agents. The label bearing the claim needs to include the certifying entity's name, website address, and logo, when the organization has a logo.

1.  FSIS accepts current organic certificates to substantiate certain animal raising claims such as: "raised without antibiotics," "no added hormones," "vegetarian diet," "no animal-by-products," "NON-GMO" and "humanely raised" with company's description and qualifier ["These are consistent with the USDA organic regulations"].

2.  As referenced previously in this document, organic claims, logos and/or websites from purchased products cannot be carried over to other products unless the company has the same certification.

3.  If an establishment produces meat or poultry products that qualify for an organic claim under the NOP, the establishment would not need to provide a written description of the product tracing and segregation mechanism because these activities are a condition of NOP certification.

NOTE: See label example

**Requesting approval for the addition of new suppliers to the documentation for a product with a previously approved label bearing animal raising claims**

LPDS has procedures in place that allow for an establishment to add a new supplier to the documentation of a previously approved label and not have to resubmit the label for another sketch approval.  For the purposes of this section, a supplier is a producer, farmer, or even another establishment that provides animals or products to another establishment to use in its products that bear the same animal raising claims. Examples would include but not limited to suppliers added for an approved product label bearing animal raising claims, meat or poultry cuts for specific breeds.   Additional suppliers must be approved by LPDS and upon approval the labeling record must be updated to reflect the new supplier(s). To obtain approval, the producing establishment would need to submit a signed and dated request to LPDS by email or letter that includes the following:

1.  The product name;
2.  The producing establishment's name, address, and establishment number; the prior label approval number; and a copy of the previously approved label application;
3.  The specific claim(s) that will be used on the product label containing source materials from the new supplier;
4.  The new supplier's name, address, and one copy of any labels with the same claim(s) previously approved by LPDS associated with the supplier or documentation to support why the claim(s) also applies to the new supplier; and
5.  Finally, for claims certified by a third-party, include a copy of the current certificate(s).  Due to the fact that most certifications expire after one year, FSIS will consider a certificate current based on a one-year time span unless the certificate states otherwise.

Once all the documentation above is evaluated, LPDS will notify the applicant in writing of its final determination. As mentioned above, this letter needs to be included as part of the supporting documentation in the producing establishment's official labeling record.

**Label Example**



The above label contains the following types of claims:
- Breed (Angus);
- Diet (Grass-fed);
- Living/Raising/Raising Conditions (Free-Range);
- Raised Without Antibiotics – Livestock/Red Meat (No Added Antibiotics);
- Raised Without Added Hormones (No Added Hormones Administered);
- Source/Traceability (Source Verified and Traceable to TMB Ranch);
- Third-Party Certification (LPDS True 2 Earth); and
- Organic (USDA Organic)



**http://askfsis.custhelp.com/**

**FSIS/USDA**
**www.fsis.usda.gov**
**2019**